GENERAL CHEMICAL
CORPORATION,
Petitioner,

v.

Gonzalo DE LA LASTRA and Amada De
La Lastra, Individually and as Personal
Representative of the Estates of Gusta-
vo De La Lastra and Jose Eduardo De
La Lastra, Decedents, Respondents.

No. D–1799.

Supreme Court of Texas.

Feb. 24, 1993.

Rehearing Overruled June 3, 1993.

Concurring Opinion of Justice
Cornyn June 3, 1993.

W. James Kronzer, Jr., Leslie C. Taylor, Houston, Royal H. Brin, Jr., Dallas, John William Black, Brownsville, for petitioner.

Elizabeth A. Davis, Houston, Ray R. Marchan, Guy Allison, Thomas F. Nye, Corpus Christi, John R. Lyde, McAllen, for respondents.

## OPINION

GONZALEZ, Justice.

This products liability case presents two principal issues. First, whether general maritime law or state law applies to the facts before us. Second, whether the punitive damages award was excessive under state law or the state constitution.

Two young men died at sea from asphyxiation on a shrimp boat expedition after using a chemical preservative on their catch. Their parents brought suit against General Chemical Corporation, the manufacturer of the chemical, and other defendants alleging negligence, gross negligence, and a violation of the Texas wrongful death statute. Among other things, General Chemical pled that this case was governed by federal maritime law. However, the jury was asked without objection to determine damages which are recoverable under state law but not under federal maritime law. Based on favorable jury findings of these issues, judgment was rendered in favor of the parents and the estates of the young men. In their individual capacity, the parents were awarded an amount for actual damages and, as representatives of the estates, they were awarded actual damages and punitive damages. The court of appeals affirmed, holding that this was not a maritime law case. 815 S.W.2d 750. We hold that state law applies because maritime law, although properly invoked, was waived in this case; we further hold that the punitive damage award exceeds the

four times actual damages cap found in TEX.CIV.PRAC. & REM.CODE § 41.007 and violates the Texas Constitution's prohibition (Art. XVI, section 26) against parents recovering punitive damages in wrongful death actions. Thus, we affirm in part and reverse and remand this cause to the trial court for a recalculation of damages consistent with this opinion.

## I.

In June 1988, Jose De La Lastra and his brother Gustavo were commercial fishermen aboard the "Wilderness," a fishing vessel which operated in the waters off Brownsville, Texas. Sodium metabisulfite, colloquially called "shrimp dip," is a product manufactured by General Chemical that is commonly used in the shrimping industry to prevent "black spots" from marring freshly caught fish. The bags in which the shrimp dip is sold are marked with a warning in English and in Spanish that says, among other things:

CAN IRRITATE THE SKIN, EYES AND RESPIRATORY TRACT, PROLONGED EXPOSURE MAY CAUSE BURNS.

HARMFUL IF INGESTED, MAY CAUSE SEVERE ALLERGIC REACTION IN SOME ASTHMATICS AND SULFITE SENSITIVE INDIVIDUALS.

REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS.

AVOID CONTACT WITH SKIN AND EYES.

DO NOT BREATH PRODUCT DUST, USE WITH PROPER VENTILATION.

DO NOT SWALLOW.

AVOID CONTACT WITH ACIDS.

CONTACT WITH WATER SHOULD BE UNDER WELL VENTILATED CONDITIONS.

Do Not Use In Dry Form.

Prepare and use dip solution on deck— NOT IN HOLD. Toxic sulphur dioxide gas may be liberated.

The De La Lastras were either unaware of or consciously disregarded this warning. They used "shrimp dip" in their vessel's hold by layering ice and dry-form shrimp dip across their catch. They were overcome by the sulfur dioxide fumes, and died of asphyxiation shortly after losing consciousness.

The parents, individually and as personal representatives of the estates of their sons, brought suit against General Chemical, and against the owner of the vessel.[1] Their cause of action was based on strict liability, negligence, and gross negligence in manufacturing and distributing a product with knowledge that the product could cause serious bodily injury or death and in failing to adequately warn of such dangers.

General Chemical pled that the deceased brothers were seamen, that the occurrence occurred beyond the territorial waters of Texas, and that therefore the rights of the parties were governed by maritime law and the Death on the High Seas Act, 46 U.S.C.App. § 761–62 (DOHSA). Under DOHSA, a party is precluded from recovering any non-pecuniary damages, such as mental anguish, loss of society, and punitive damages. General Chemical asserts that this pleading is sufficient to invoke the common law doctrine of general maritime law.

The jury found that the deaths occurred within the territorial waters of Texas, that General Chemical was guilty of negligence and gross negligence in failing to provide an adequate warning on their product of the dangers associated with its use, and that the failure to warn rendered the product in question unreasonably dangerous as marketed. Based on the jury verdict, the parents were awarded a $44,628,698.63 judgment against General Chemical.[2]

---

1. Only General Chemical is a party to this appeal. The claim against the owner of the vessel was severed.

2. The damages awarded were as follows:

## II.

General Chemical argues that maritime law, and not state law, controls this case, and therefore nonpecuniary damages of loss of society and companionship, mental anguish, and punitive damages are not recoverable. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, — 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990).[3]

■ There is little question that the facts of this case come within the purview of maritime law. *See Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Although neither DOHSA, 46 U.S.C.App. § 761, nor the Jones Act, 46 U.S.C.App. § 688, provides a remedy under these circumstances,[4] the United States Supreme Court in *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970), has recognized a common law remedy for wrongful deaths occurring in territorial waters under the general maritime law. Therefore, general maritime law is applicable to the facts of this case.

■ When invoked, maritime law becomes the exclusive remedy under which a party may proceed, preempting all state law grounds of recovery. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986); *Mandell & Wright v. Thomas*, 441 S.W.2d 841 (Tex.1969). Nevertheless, the issue squarely before us is whether maritime law, although properly invoked, can be waived. We conclude that it can. Both the United States Supreme Court and this Court, as well as many federal circuits, have held that preemption arguments which affect the choice of law, and not the choice of forum, are waivable. *See International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 393, 106 S.Ct. 1904, 1913, 90 L.Ed.2d 389 (1986); *Heci Exploration Co. v. Holloway*, 862 F.2d 513, 520 (5th Cir.1988); *Dueringer v. General American Life Ins. Co.*, 842 F.2d 127, 130 (5th Cir.1988); *Johnson v. Armored Transport of Calif., Inc.*, 813 F.2d 1041, 1043–44 (9th Cir.1987); *Gilchrist v. Jim Slemons Imports, Inc.*, 803

To the parents individually (wrongful death):

| | |
|---|---|
| Pecuniary loss (Gustavo) | $ 500,000.00 |
| Pecuniary loss (Jose) | $ 500,000.00 |
| Loss of companionship and society (Gustavo) | $ 2,500,000.00 |
| Loss of companionship and society (Jose) | $ 2,500,000.00 |
| Mental anguish (Gustavo) | $ 2,500,000.00 |
| Mental anguish (Jose) | $ 2,500,000.00 |
| Cost of psychological care | $ 5,000.00 |

To the parents as representatives of Gustavo's estate: (survival damages):

| | |
|---|---|
| Pain and mental anguish | $ 1,000,000.00 |
| Punitive damages | $15,000,000.00 |

To the parents as representatives of Jose's estate: (survival damages):

| | |
|---|---|
| Pain and mental anguish | $ 1,000,000.00 |
| Punitive damages | $15,000,000.00 |
| Prejudgment interest | $ 1,623,698.63 |
| Total | $44,628,698.63 |

3. *Miles* impliedly overruled previous decisions recognizing a right of recovery for loss of society damages under general maritime law. *See Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), and *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). General Chemical argues that *Miles* would control here if maritime law applies, although that case involved a suit by a seaman against his employer. We do not today decide whether the *Miles* holding extends to actions against third parties, such as General Chemical.

4. DOHSA provides a remedy for wrongful death occurring on the high seas, beyond three nautical miles from shore, while the Jones Act provides a remedy for seamen against their employers. This incident occurred in the territorial waters of Texas, and is an action against a third party, not the decedents' employer.

F.2d 1488, 1497 (9th Cir.1986); *Gorman v. Life Ins. Co. of North America,* 811 S.W.2d 542, 545 (Tex.1991). Pursuant to the "savings to suitors" clause of 28 U.S.C. § 1333, state courts have concurrent jurisdiction with the federal courts over maritime actions, constrained by the " 'reverse-Erie' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 223, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986); *see also Texaco Ref. and Mktg, Inc. v. Estate of Dau Van Tran,* 808 S.W.2d 61, 64 (Tex.), *cert. denied,* —— U.S. ——, 112 S.Ct. 301, 116 L.Ed.2d 245 (1991). Thus, maritime law does not affect a court's jurisdiction over the claim, it merely dictates the substantive law that governs that claim's resolution. As such, maritime law is a choice of law determination that can be waived.

■ Under the facts of this case General Chemical waived the application of maritime law by failing to object to evidence and jury questions regarding damages which are not recoverable under maritime law.

■ Although it asserted that DOHSA controlled, General Chemical failed to bring to the trial court's attention the potential applicability of general maritime law limitations on damages. Instead, General Chemical incorrectly assumed that, if the jury found that the deaths occurred in territorial waters, federal law supplied no remedy and the claim would therefore be governed by Texas law. General Chemical submitted an issue inquiring if the deaths occurred beyond three nautical miles from shore. After a negative jury finding, precluding

the applicability of DOHSA, the remaining questions that were submitted were damages recoverable under the Texas wrongful death and survival statutes; including elements of damages not recoverable under general maritime law. General Chemical did not object to the submission of these issues, *see* TEX.R.CIV.P. 274, and in fact, requested the very issues that it now seeks to avoid.[5] Parties may not invite error by requesting an issue and then objecting to its submission. *See Daily v. Wheat,* 681 S.W.2d 747, 754 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *City of Amarillo v. Langley,* 651 S.W.2d 906, 914 (Tex.App.—Amarillo 1983, no writ); *Beasley v. Baker,* 333 S.W.2d 212, 214 (Tex.Civ. App.—Amarillo 1960, no writ). Further, it was not until its motion for rehearing in the court of appeals that General Chemical asserted the applicability of maritime law; and in its post submission brief to this Court, General Chemical admits that the judgment was based on state law.[6]

General Chemical defends its submission of state law damages and its failure to assert the application of federal law in the trial court by claiming that the United States Supreme Court had not yet recognized a wrongful death action for seamen under general maritime law, and, alternatively, the damages recoverable under general maritime law had not been fully developed; it wasn't until *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1991), decided while this case was pending in the court of appeals, that the Supreme Court recognized this ground of recovery and established its available damages. This argument fails on both grounds.

As previously discussed, an action under general maritime law for wrongful deaths

---

**5.** Without a doubt it is evident that at trial, General Chemical relied on state law. In a response to a motion in the court of appeals, General Chemical stated:

[t]he judgment against the appellant herein is not under the *Jones Act* but rather under common law and statutory law of the state of Texas. Appellant is not appealing any claim under the Jones Act but rather a claim under the Texas common law of negligence and strict product liability.... Here the suit

against the employer and shipowner ... was severed and made the subject of a separate action.

**6.** The liability issues under state and federal law are identical. The only potential distinction is the recoverable damages. Therefore, in order to determine under what law the judgment was based, this distinction becomes a critical inquiry.

occurring in territorial waters was recognized over twenty years ago in *Moragne v. States Marine Lines, Inc., supra.* While *Moragne* left open the question of what damages were available under this ground of recovery, subsequent Supreme Court and federal circuit decisions have addressed this issue. In *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 585, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974), the Court held that, in general maritime wrongful death actions, a decedent's dependents may recover damages for loss of support, services, and society, but not for mental anguish. This holding was reiterated in *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 216, 106 S.Ct. 2485, 2491, 91 L.Ed.2d 174 (1986) and *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 622, 98 S.Ct. 2010, 2013, 56 L.Ed.2d 581 (1978).[7]

The fifth circuit has also addressed the damages available under general maritime law. In *Sistrunk v. Circle Bar Drilling Co.,* 770 F.2d 455, 459 (5th Cir.1985), and *Patton–Tully Trans. Co. v. Ratliff,* 797 F.2d 206, 213 (5th Cir.1986), the court, following *Gaudet,* held that parents could not recover loss of society damages absent a showing of dependency upon the deceased children. *See also Truehart v. Blandon,* 672 F.Supp. 929, 930 (E.D.La.1987); *Hebert v. Otto Candies, Inc.,* 402 F.Supp. 503, 507 (E.D.La.1975). Further, *Miles,* the very case General Chemical now relies upon, was a fifth circuit opinion, decided prior to the underlying trial of this case. 882 F.2d 976 (5th Cir.1989), *aff'd,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1991).

These cases illustrate that, at the time this case went to trial, not only was there an available federal remedy, but also that state and federal law contained separate and distinct elements of damages; under maritime law mental anguish damages were unavailable and loss of society could

only be recovered upon a showing of dependency. General Chemical was obligated to object to jury questions on such damages in order to preserve error. Although the Supreme Court did not decide *Miles* until later, General Chemical was required to object to jury questions concerning these damages in order to receive the benefit of a change in the law—to the extent there was one—on appeal. By failing to pursue its available federal remedy at trial, instead choosing to submit issues based on state law, General Chemical has waived the application of general maritime law.

### III.

■ We next consider the punitive damages issue. General Chemical asserts that the punitive damage award cannot stand because there was no evidence to support the jury finding of gross negligence. We disagree.

■ There was evidence of a prior incident in 1973 involving the shrimping vessel "Cape Rojo." This case involved facts nearly identical to this one. Two shrimpers were asphyxiated in the boat's hold when they spread sodium metabisulfite across iced shrimp. Following an investigation of the deaths, the Coast Guard sent a letter to Allied Chemical, General Chemical's predecessor, advising them to adequately warn consumers of the potential dangers associated with use of this product. While it is true that the Coast Guard report does not state that users of the product should be warned that the chemical is deadly, Commander Pangrass of the United States Coast Guard testified that this is the type of warning that they were trying to get the manufacturer to give. There was further testimony that Allied Chemical knew of at least nine other incidents of death and/or injury involving sodium metabisulfite.[8]

---

7. Although *Tallentire* and *Higginbotham* addressed issues that are different than those facing us today, both expressly recognized that, under *Gaudet,* loss of society damages were available under general maritime law.

8. The dissent suggests that the non-fatal injuries involved different circumstances and are therefore not probative evidence of General Chemical's gross negligence. We disagree. All of the injuries involved incidents of asphyxiation.

Despite this knowledge General Chemical failed to place warnings which informed users of the risk of death. There was also testimony from a warnings expert that General Chemical's warnings were grossly inadequate considering the known dangers and effects of sodium metabisulfite. We conclude that all of this evidence amounts to some evidence of gross negligence.[9]

■ Having concluded that there is some evidence upon which to base an award of punitive damages, we next consider whether the punitive damages awarded in this case were excessive under state law and the constitution. General Chemical asserts that the punitive damage award is governed by section 41.007 of the Texas Civil Practice and Remedies Code and must therefore be reduced to four times the actual damage award. At the same time General Chemical challenges the punitive damage award as unconstitutionally excessive under article I, section 19 of the Texas Constitution. TEX.CIV.PRAC. & REM.CODE § 41.007 states: "Except as provided by Section 41.008, exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." Although this provision does not apply to intentional torts or torts in which there is finding of malice as defined by § 41.-001(6)(A), when applicable, the amount of punitive damages to which a party is entitled is limited to four times the amount of actual damages recovered.

In determining the amount of actual damages to use as a base in calculating the four to one ratio, the trial court included the parents' wrongful death recovery. This represented an actual damage figure

of over $6,500,000 on which the $15,000,000 punitive damages awarded to each estate was to be based; just over a 2 to 1 ratio. Accordingly, the trial court rendered judgment for the full amount of the jury award.

Petitioners assert that including the parents' wrongful death recovery as actual damages in the ratio calculation of section 41.007 allows the parents to recover punitive damages for wrongful death in violation of TEX. CONST. art. XVI, § 26. Rather, they contend that the amount of actual damages that should be used in determining the permissible ratio is the $1,000,000 each estate received under the survival recovery; thus, each estate would be limited to a punitive damages recovery of $4,000,-000. We agree.

TEX. CONST. art. XVI, § 26 provides:

Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

At common law, a cause of action for personal injuries and the right to exemplary damages for the willful or wanton conduct of the tortfeasor terminated with the deceased. In order to give the decedent's survivors an available remedy, Texas passed the Wrongful Death Act. However, this Act was said to have created a new cause of action, as opposed to a mere continuation of the deceased's cause of action, and thus the right to recover exemplary damages still terminated upon the death of the decedent. The constitutional provision

One of the individuals injured was an employee of Allied Chemical who was merely transporting the sodium metabisulfite. This is competent evidence of General Chemical's actual knowledge of the risks involved with the handling of the product.

9. The dissent argues that if the De La Lastras would have used the product in accordance with the instructions, the chemical would not have been deadly. While perhaps this is true, it

confuses the inquiry. Although the label contained proper *instructions* regarding the product's *use*, it failed to adequately *warn* of the serious *consequences* associated with this foreseeable use. Furthermore, as the dissenting opinion acknowledges, since General Chemical did not challenge the jury's finding that the warning was inadequate, "the inadequacy of the warning label must be taken as an established fact." At 926.

was enacted to allow the survivors to recover exemplary damages. TEX. CONST. art. XVI, § 26, interp. commentary; *Scoggins v. Southwestern Elec. Serv. Co.*, 434 S.W.2d 376 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.).

 It is well established that this provision defines the class of persons who are entitled to recover punitive damages for wrongful death; parents of the deceased, while they are entitled to maintain an action under the Wrongful Death statute, are not included in article XVI, § 26 and are therefore unable to recover punitive damages. TEX.CIV.PRAC. & REM.CODE § 71.004; *Winnt v. Int'l & G.N. Ry. Co.*, 74 Tex. 32, 11 S.W. 907, 908 (1889); *see also Houston & T.C. Ry. Co. v. Baker*, 57 Tex. 419, 424 (1882) (holding that parents are not among those who are entitled to recover exemplary damages for wrongful death under article XVI, § 30 of the Texas Constitution of 1869). The Wrongful Death statute cannot broaden the class of persons entitled to recover punitive damages beyond the scope of article XVI, § 26 of the constitution. *Scoggins*, 434 S.W.2d at 380. In 1889 this Court, analyzing the relationship between article XVI, § 26 and the Wrongful Death Act said, "the right to maintain an action for the recovery of exemplary damages for the death of a person . . . is confined to the class of persons who, by the terms of the constitution, are designated as entitled to maintain such action; namely the surviving husband or wife, or heirs of the body, of the deceased, and not to the parent." *Winnt*, 11 S.W. at 908.

In the instant case, the court of appeals affirmed the trial court's damage award, rejecting petitioner's argument that the constitution prohibits the inclusion of the parents' wrongful death recovery in the punitive damages calculation. 815 S.W.2d at 758. The court of appeals rested its

conclusion on this Court's decision in *Hofer v. Lavender*, 679 S.W.2d 470 (Tex.1984) and on the definition of "claimant" as defined in TEX.CIV.PRAC. & REM.CODE § 41.001(1).[10] Under section 41.001(1), when a party is seeking exemplary damages for the death of an individual, both the deceased and the persons seeking recovery are defined as a claimant.

 Although "claimant" appears nowhere in the punitive damages limitation provision of section 41.007 and would seem to have no application, Senator Montford, the author of this chapter, in an article in the Houston Law Review, gave his view that anyone who seeks recovery of exemplary damages under Chapter 41 is a claimant for all purposes of this chapter, including section 41.007, and that both the parent's and the child's recovery are to be included in calculating the punitive damages ratio. Montford and Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System Part Two*, 25 Houston L.Rev. 245, 316 (1988). Nevertheless, the intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute. It is at most persuasive authority as might be given the comments of any learned scholar of the subject. Even if Senator Montford's interpretation is correct, however, just as the Wrongful Death statute cannot expand upon the Constitution, neither can section 41.007.

As previously noted, the court of appeals also relied on our decision in *Hofer v. Lavender*, 679 S.W.2d 470 stating:

[a]ppellants rely on *Hofer v. Lavender* (citations omitted), which held that parents cannot recover exemplary damages under the Wrongful Death Act. The court in *Hofer*, however, stated that "ex-

---

**10.** Section 41.001 defines claimant as:

a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of exemplary damages. In a cause of action in which a party seeks recovery of exemplary damages related to injury to

another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of exemplary damages. TEX.CIV.PRAC. & REM.CODE § 41.001(1).

emplary damages survive to the estate, whoever the beneficiaries of that estate may be." *Id.* at 476. In the instant case, the beneficiaries of the estate are Gonzalo and Amada De La Lastra.

This conclusion is based upon a misapplication of *Hofer.* In *Hofer,* this Court addressed the issue of whether the parents, as beneficiaries, are entitled to punitive damages that are awarded to the estate of the deceased under a survival cause of action. Concluding that the parents were entitled to recover, we said,

> [t]he survival statute did not create a new cause of action, but kept alive the cause of action that the deceased might have had. It makes no sense to say that a tortfeasor may have exemplary damages assessed against him in favor of a decedent's estate if the beneficiaries of the estate are a spouse or children, but not if the beneficiaries are otherwise.... exemplary damages survive to the estate, whoever the beneficiaries of that estate may be.

*Id.* at 476. The rationale behind allowing parents, as beneficiaries, such a recovery is that in a survival cause of action the *estate* is seeking punitive damages, not the parents; the classification of the beneficiaries of the estate should not determine the estate's ability to seek this recovery. However, to allow parents, as beneficiaries of an estate, to also include their recovery for *wrongful death* with their survival recovery would impermissibly extend *Hofer,* allowing parents to circumvent article XVI, § 26 by bootstrapping their wrongful death recovery to their survival damages in order to procure a larger punitive damage award. This should not and can not be the result. Wrongful death and survival recoveries are independent of one another, and the availability of one should in no way affect the other.

It is well settled that had the De La Lastras brought only a wrongful death action, they would not be entitled to recover

punitive damages. *Hofer,* 679 S.W.2d at 475; *Winnt,* 11 S.W. at 908; *Houston,* 57 Tex. at 424 (1882). It is therefore illogical to allow these damages to be included when a survival recovery is also effectuated. If the parents, as representatives of the estate, were to bring a survival action only, each estate would be limited to a punitive damage recovery of $4,000,000; four times the actual damages award of $1,000,000. By including the wrongful death recovery, however, the punitive damage award of $15,000,000 falls within the permissible recovery ratio; a recovery that would not be allowed, but for the inclusion of the wrongful death damages. Thus, including these wrongful death damages effectively allows the parents to recover punitive damages of $11,000,000 for wrongful death, as opposed to receiving as beneficiaries what the estate was entitled to under their survival cause of action. Such a recovery clearly violates article XVI, § 26. Accordingly, we hold that the De La Lastra's wrongful death recovery cannot be used in calculating the amount of actual damages for purposes of determining the amount of recoverable punitive damages. Therefore, the award of $15,000,000 in punitive damages to each estate must be reduced.

General Chemical also asserts that the current Texas system of awarding punitive damages, and the resulting excessive punitive damage award deprived them of their constitutional rights of due process as guaranteed by article I, § 19 of the Texas Constitution and the Fourteenth Amendment to the United States Constitution. Petitioners rely on *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), in which the United States Supreme Court addressed the question of whether an excessive punitive damage award violates due process under the Fourteenth Amendment. Although the Court found the damage award in that case to be constitutional,[11] it did recognize that in certain circumstances a

---

11. The punitive damages awarded in *Haslip* were about $840,000. The compensatory dam-

due process challenge to excessive punitive damages could be made. The Court undertook an individualized analysis, focusing on the procedural safeguards afforded a defendant, such as the amount of discretion the jury has in its determination of punitive damages, the instructions the jury received which inform the jury of the policy and purpose behind punitive damages, and the trial court and appellate review of the jury award. Nevertheless, because we conclude that section 41.007 mandates a reduction in the punitive damages, we need not address whether or not this award was unconstitutionally excessive in light of *Haslip*.[12]

The survival recovery for each estate was $1,000,000, thus each estate is entitled to receive $4,000,000 in punitive damages. This equates to a total punitive damage recovery of $8,000,000. We therefore reverse the judgment of the court of appeals as it relates to punitive damages and remand this cause to the trial court to render judgment consistent with this opinion.

Concurring opinion by CORNYN, J.

Concurring and dissenting opinion by HECHT, J., joined by PHILLIPS, C.J., and ENOCH, J.

CORNYN, Justice, concurring.

[Filed June 3, 1993]

I agree with the court that there was some evidence of gross negligence presented in the trial court. I concur in the judgment rather than join the court's opinion, however, because I cannot agree with the remainder of the opinion.

HECHT, Justice, concurring and dissenting.

[Filed Feb. 24, 1993]

I agree with the Court that General Chemical cannot complain on appeal that

federal maritime law precludes recovery of damages for nonpecuniary loss—damages for mental anguish and loss of society, and punitive damages—when that complaint was not made in the trial court. Hence, I join in Part II of the Court's opinion. I write separately on this issue only because I believe that General Chemical's reliance upon *Texaco Ref. & Mktg., Inc. v. Van Tran*, 808 S.W.2d 61 (Tex.1991), deserves an additional response. I do not agree, however, that there is any probative evidence to support an award of punitive damages. Thus, while I believe the Court is correct in Part III of its opinion that TEX. CIV.PRAC. & REM.CODE § 41.007 limits the amount of punitive damages which *could* be awarded in this case, I would hold that there is no basis for any award at all, not the $30 million found by the jury nor the $8 million approved by the Court. I also believe the Court is remiss in refusing to address General Chemical's arguments that the award of punitive damages in this case violates constitutional due process guaranties. I discuss first the evidence to support punitive damages, then the constitutional arguments, and finally our decision in *Van Tran*.

**I**

There is no question that if Gustavo and Jose Eduardo De La Lastra had followed the warnings and instructions printed on the sack of sodium metabisulfite they were using, their tragic deaths would have been avoided. Sodium metabisulfite, commonly referred to as "shrimp dip" by those associated with the shrimp fishing industry, is a chemical used to preserve shrimp after they are caught. It is called "dip" because, as properly used, the chemical, a dry powder, is mixed with water and shrimp are dipped in the solution and then removed, drained and stored. Like many chemicals,

ages were $200,000. This amounts to a ratio of approximately 4.2 to 1.

12. General Chemical asserts the applicability of section 41.007 and seeks to have the 4–1 ratio imposed. We need not address whether such a

ratio will in all cases withstand a constitutional challenge. Contrary to the dissent's view, General Chemical has not raised a constitutional challenge to section 41.007.

sodium metabisulfite is not dangerous if it is used properly, but there are dangers associated with its misuse. Specifically, it reacts with water to produce sulfur dioxide gas, which if inhaled can cause asphyxiation. Since this gas is heavier than air and thus will accumulate in any confined space, the chemical should be used only in an area that is well ventilated.

General Chemical sells sodium metabisulfite in 50–pound bags. On each bag is a warning label which covers about two-thirds of one side. The text on the left side of the label is in English, and the text on the right side is in Spanish. Each side is about the size of a letter-sized sheet of paper (8–½″ × 11″). The English text is printed in all capital letters, while the Spanish text is in both lower and upper case. Portions of the text are in black print and portions are in red print. All of the print is larger than that in the text of ordinary reading materials, such as newspapers and magazines. There is no contention in this case that the label is inconspicuous, or that the print is too small, or that the warnings are hard to understand.

The label begins in large capital letters: WARNING! (in Spanish, *PELIGRO* ). It states that the chemical should not be ingested, inhaled or touched. It gives instructions for the proper use and handling of the chemical as well as for remedies if the chemical is mishandled. A propos of this case, the warning label states in part:

WARNING!

. . . . .

REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS....
USE WITH PROPER VENTILATION....
CONTACT WITH WATER SHOULD BE UNDER WELL–VENTILATED CONDITIONS....

SPECIAL INSTRUCTIONS

CONTROL OF "BLACK SPOT"
ON SHRIMP

Use as 1¼% solution. Stir 3¼ pounds (about 2½ pints) of Sodium Metabisulfite in 30 gallons of fresh clean seawater until dissolved. Use plastic, rubber or plastic lined container of adequate size and a wood or plastic stirrer. Dehead shrimp and place in plastic sieve. Dip in solution and agitate 1 minute. Drain well and pack in ice as usual.

WARNING!

Do Not Use In Dry Form.

Prepare and use dip solution on deck— NOT IN HOLD. Toxic sulfur dioxide gas may be liberated.

There is no evidence that a more extensive warning label was used by any other manufacturer of the chemical. A copy of the entire label is attached as an appendix to this opinion.

The De La Lastras did precisely what the instructions warned against. They used the chemical in dry form instead of mixing it with water as the label instructed, and they sprinkled the chemical on their shrimp in the unventilated hold of their boat instead of using it on deck. When they did, toxic sulfur dioxide gas was released—exactly as the label warned it would be—and asphyxiated them. No one disputes that if the De La Lastras had followed the warnings and instructions on the label, they would not have died; but there is nothing to indicate that the De La Lastras ever even read the label.

The jury found that the warning label was inadequate because it did not expressly state that the toxic gas produced by misuse of the product could be fatal. The jury also found that this inadequacy in the label caused the De La Lastras' deaths. General Chemical challenged these findings unsuccessfully in the court of appeals, but it has not raised those challenges in this Court. Consequently, the inadequacy of the warning label must be taken as an established fact.

The award of punitive damages in this case is based upon the jury's finding that General Chemical was grossly negligent in failing to warn expressly that misuse of its product could be fatal. The trial court

correctly defined gross negligence for the jury to mean:

> more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

This definition is taken verbatim from TEX. CIV.PRAC. & REM.CODE § 41.001(5). The jury also found, in answer to a separate question, that General Chemical's failure "was with a flagrant disregard for the rights of others and with actual awareness on [its] part ... that such a failure [would], in reasonable probability, result in human death or great bodily harm." The parties do not argue that this second finding provides a different basis for punitive damages, and it is not clear why the trial court thought it appropriate to submit two separate questions. In any event, it is necessary to consider only whether there is evidence to support a finding of gross negligence.

In *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981), this Court stated:

> The essence of gross negligence is not the neglect which must, of course, exist. What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e. knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril but his acts or omissions demonstrated that he didn't care.

We also held that evidence that a defendant exercised *some* care cannot be considered in determining the legal sufficiency of the evidence to support a finding of gross negligence. *Id.* at 920–922. While this part of our holding in *Burk Royalty* has been the subject of substantial criticism, General Chemical does not challenge *Burk*

*Royalty* in this case. Rather, General Chemical argues that even under the restricted review allowed by *Burk Royalty*, there is no probative evidence in this case of gross negligence. Thus, the continued validity of the *Burk Royalty* standard of review for the sufficiency of the evidence of gross negligence is not at issue here.

While plaintiffs are entitled to have the evidence and all reasonable inferences which can be drawn from it viewed in the light most favorable to the verdict, there must nevertheless be evidence in the record that General Chemical was knowingly indifferent to the rights, welfare and safety of those who used its product. Even by plaintiffs' account, there is not a wealth of such evidence in this record. Although the trial of this case consumed six days, plaintiffs cite only three pieces of evidence in support of the jury's finding of gross negligence. The Court discusses only two of them. None provides sufficient support for the finding.

The piece of evidence on which plaintiffs place principal reliance, is that General Chemical failed to change its warning despite its awareness of, in plaintiffs' words, "nine prior deaths and/or injuries from the chemical." Actually, plaintiffs offered evidence of three prior deaths and six prior injuries from the use of sodium metabisulfite. Of the non-fatal injuries, none was shown to have involved shrimpers in similar circumstances. Even if the circumstances of any injury had been similar and had been known to General Chemical, such knowledge of non-fatal injuries would not suggest that its warning was inadequate in failing to warn that misuse of the product could be fatal. Of the three deaths, there is no evidence concerning the circumstances of one which appears to have occurred in 1981, seven years before the De La Lastras' accident. The other two deaths did occur in circumstances similar to the De La Lastras', and it is on this incident that plaintiffs rely for their contention that General Chemical knowingly failed to change its warning label.

The parties refer to these two deaths as the "Cape Rojo" incident. It occurred in 1973, 15 years before the accident in this case.[1] The Coast Guard investigated the incident and afterward wrote General Chemical and other manufacturers of the same chemical, stating that "[p]romulgation and dissemination of safety information regarding this product may be indicated." The Coast Guard report stated: "It is recommended that since it was reported that Sodium Bisulfite Anhydrous is widely used by fisherman [sic] throughout the industry, that an expeditious means be devised to warn users of the chemical, aboard vessels, of the potential dangers involved in its use in a confined and unventilated space." After receiving this report, General Chemical changed its warning twice, cautioning against the dangers involved in the Cape Rojo incident, viz., use of the product in an unventilated space or in the hold of a boat. The Coast Guard report does not state that users of the product should be warned that the chemical is deadly; in fact, if used properly in accordance with the instructions, the chemical was not deadly.[2]

There is no dispute that General Chemical modified its warning label following the Cape Rojo incident. Plaintiffs may of course argue that General Chemical's modifications did not go far enough, and the finding that the warning label was inadequate indicates that the jury was persuaded by that argument. Gross negligence, however, requires more than an inadequate response to perceived dangers; it requires actual conscious indifference. Not only is there no evidence that General Chemical reacted with indifference to the Cape Rojo incident, the evidence establishes that it

attempted to comply with the Coast Guard's recommendations.

Plaintiffs' assertion that General Chemical knew of other occurrences involving fatalities from the misuse of sodium metabisulfite but did not care enough to change its warning is based upon one incident 15 years before, after which General Chemical changed its warning twice. Assuming that General Chemical should have warned that misuse of its chemical could be fatal, I fail to see how that failure was gross negligence—"actual conscious indifference" of others' safety—when it changed its warning twice after the earlier incident, used the most extensive warning of any other manufacturer of the product, and warned explicitly against the exact misuse which occurred in both the Cape Rojo and De La Lastra incidents. The fact that there were only three deaths involving the product over the 15 years before the accident in this case also suggests that General Chemical did not fail to respond appropriately.

The second piece of evidence on which plaintiffs rely to support the finding of gross negligence is that General Chemical's representative testified in response to cross-examination by plaintiffs' counsel at trial that the company did not intend to change its warning despite the De La Lastras' deaths. Given General Chemical's position that its warning was adequate, its representative's testimony is hardly surprising. The jury's finding that the warning was inadequate does not transform the testimony of General Chemical's representative into evidence of conscious indifference. Again, even if General Chemical did not do everything it should have done, and even if it intended not to do all it could

1. Although General Chemical was not in existence at the time, its predecessor corporation was, and the parties agreed at trial that notice of the Cape Rojo incident to General Chemical's predecessor was notice to General Chemical. Thus, by referring to the manufacturer as General Chemical I include both that corporation and its predecessor.

2. At trial, when plaintiffs' counsel asked the Coast Guard official who wrote the report whether he had been trying by his report to get

General Chemical to warn that its product could be deadly, he replied, "basically". Whatever the official may have been "basically" trying to do, the report itself neither stated or suggested that General Chemical should warn that its product was deadly. General Chemical was not simply being obtuse; none of the other manufacturers alerted to the Cape Rojo incident changed their warnings to include that their products could be deadly.

have done, there is still no probative evidence that it was actually indifferent to its responsibility to warn of the dangers associated with its product. Moreover, the representative's testimony at trial of his intention at that time is, logically, no evidence of General Chemical's intention prior to the De La Lastras' deaths several years before.

The last piece of evidence cited by plaintiffs is the testimony of their expert at trial that in his opinion General Chemical had been grossly negligent. The expert based his opinion exclusively on the Cape Rojo incident and other instances of injuries cited by plaintiffs. For reasons already discussed, none of those prior incidents are evidence that General Chemical was grossly negligent. Stripped of all support, the expert's opinion is entitled to no weight and thus does not support a finding of gross negligence.

There is no probative evidence that General Chemical was grossly negligent, and therefore there is no basis for an award of punitive damages. Even applying the restrictive standard of *Burk Royalty*, plaintiffs must still show that General Chemical knew of the peril its warning could cause and yet did not care. General Chemical simply cannot be said to have been indifferent to the dangers which could result from misuse of its product when it gave clear, conspicuous, bilingual warnings, more thorough than any others in the industry, which would have prevented the De La Lastras' deaths if only they had heeded those warnings. The world is full of products, from cars to cleansers, which if misused may cause death. One should certainly expect that misuse of toxic chemicals may be lethal. Manufacturers may be obliged to warn against misuse of their products. When they do, however, and when the warnings given would have prevented an accident if they had been followed, it is wrong to assign liability for the accident to the manufacturer. It is worse still, however, to *punish* it for not caring. General Chemical has been held liable for

an accident its warning would have prevented. It has been assessed over $13 million for the actual damages suffered in the accident, including $2 million for the mental anguish the De La Lastras suffered during the thirty seconds before each lost consciousness. On top of this, the Court holds that General Chemical should be assessed a penalty of $8 million because it did not care that the De La Lastras might die from misusing its product. Absent any evidence to support it, the award of punitive damages in this case is an injustice.

## II

General Chemical challenges the award of punitive damages in this case on three separate grounds: that there is no probative evidence of gross negligence to support an award of punitive damages, that punitive damages cannot exceed four times actual damages under TEX.CIV.PRAC. & REM. CODE § 41.007, and that an award of punitive damages in this case violates the due process and due course of law guaranties of the United States Constitution and the Texas Constitution. The Court rejects the evidentiary argument, accepts the statutory argument, and ignores the constitutional argument. Because I accept the evidentiary argument, I need not consider the statutory argument, although I do not disagree with the Court's analysis of the application of section 41.007 in this case. I also need not reach General Chemical's constitutional arguments. The Court, however, cannot avoid them.

In a footnote, the Court suggests that General Chemical concedes that an award of punitive damages equal to four times actual damages in this case does not offend due process. *Ante* at 925 n. 12. In the text of its opinion, however, the Court acknowledges that "General Chemical ... asserts that the current Texas system of awarding punitive damages, *and* the resulting excessive punitive damage award deprived them of the constitutional rights of due process...." *Ante* at 924. The text is correct; the footnote is not. Al-

though General Chemical argues that punitive damages cannot exceed four times actual damages under section 41.007, it does not concede that such an award comports with due process. The Court's footnote adds a non sequitur: "Contrary to the dissent's view, General Chemical has not raised a constitutional challenge to section 41.007." While it is true that General Chemical has not attacked the constitutionality of section 41.007, that fact is not "contrary to the dissent's view". Nor is the fact significant. Section 41.007 caps punitive damages; it does not immunize any award up to the cap from constitutional scrutiny. General Chemical need not attack the statutory cap to argue that the system of awarding punitive damages is flawed. General Chemical can and does argue that an award of punitive damages cannot exceed those allowed by statute, *and also* that any award in these circumstances offends due process.

The Court itself recognizes in the text of its opinion that General Chemical argues that the system itself, both before and after judgment in the trial court, is invalid. The Court rejects this argument without explaining why. There are only two possible bases for the Court's conclusion: either that a punitive damage award of four times actual damages never violates due process, or that such an award of punitive damages does not violate due process in this case. The Court disavows the former premise: "We need not address whether [a 4–1] ratio will in all cases withstand a constitutional challenge." *Ante* at 925 n. 12. The second premise is thus the only remaining basis for the Court's decision.

It may be perfectly reasonable to conclude that an award of $8 million punitive damages in this case does not violate due process. It is not reasonable, however, or even acceptable, to reach this conclusion without saying why. The parties have argued the issue fully in their briefs, and we have received amicus curiae briefs on the issue. The issue is among those on which we granted General Chemical's application

for writ of error. 35 TEX.SUP.CT.J. 508–509. The issue was addressed at oral argument. The issue is an important one in this state, in other states, and in the United States. The Court makes no attempt to justify its refusal to address the issue. It delivers the parties an edict rather than an opinion.

### III

As I stated at the outset, I agree with the Court that General Chemical has not preserved a complaint that recovery of nonpecuniary damages is barred by the application of federal maritime law. General Chemical makes an additional argument, however, that the Court does not address. General Chemical contends that in circumstances indistinguishable from this case, the Court reversed an award of loss of society damages in *Van Tran*. General Chemical is correct. In *Van Tran*, Texaco objected to an award of mental anguish damages as being precluded by federal maritime law, but it did not raise a similar objection to the award of loss of society damages. While *Van Tran* was on appeal, the United States Supreme Court held in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), that loss of society damages cannot be recovered under federal maritime law. We reversed the award of mental anguish damages to which Texaco properly objected, but we also reversed the award of loss of society damages to which Texaco did not object.

Following *Van Tran*, General Chemical's failure to object in the trial court to an award of nonpecuniary damages not allowed under maritime law should not preclude it from obtaining reversal on appeal. In my view, however, *Van Tran* was wrongly decided in this respect. A party, whether plaintiff or defendant, is entitled to the benefit of changes in the law while a case is on appeal as long as those changes are fully retroactive. However, the party should ordinarily be required to have raised the issue at trial in order to assert it on appeal. I would not extend the error in *Van Tran* to this case.

\* \* \* \* \* \*

For all these reasons, I concur in affirming the award of actual damages but dissent from the award of punitive damages.

PHILLIPS, C.J., and ENOCH, JJ., join in this concurring and dissenting opinion.

APPENDIX

# WARNING!

CAN IRRITATE THE SKIN, EYES AND RESPIRATORY TRACT. PROLONGED EXPOSURE MAY CAUSE BURNS.
HARMFUL IF INGESTED. (MAY CAUSE SEVERE ALLERGIC REACTION IN SOME ASTHMATICS AND SULFITE SENSITIVE INDIVIDUALS).
REACTS WITH ACIDS AND WATER, RELEASING TOXIC SULFUR DIOXIDE GAS.
AVOID CONTACT WITH SKIN AND EYES.
DO NOT BREATHE PRODUCT DUST. USE WITH PROPER VENTILATION.
DO NOT SWALLOW.
AVOID CONTACT WITH ACIDS.
CONTACT WITH WATER SHOULD BE UNDER WELL-VENTILATED CONDITIONS.

FIRST AID:
IN CASE OF CONTACT:SKIN: PROMPTLY WASH WITH PLENTY OF SOAP AND WATER. EYES: IMMEDIATELY FLUSH WITH PLENTY OF WATER FOR 15 MINUTES. GET MEDICAL ATTENTION. IF SWALLOWED: IF CONSCIOUS, IMMEDIATELY DRINK 2 TO 4 GLASSES OF WATER OR MILK AND INDUCE VOMITING BY TOUCHING FINGER TO BACK OF THROAT. GET IMMEDIATE MEDICAL ATTENTION. IF INHALED: REMOVE TO FRESH AIR. GET MEDICAL ATTENTION FOR IRRITATION OR ANY OTHER SYMPTOMS.

IN CASE OF FIRE:
WEAR SELF CONTAINED RESPIRATORY PROTECTION. PRODUCT DOES NOT BURN BUT WILL RELEASE TOXIC SULFUR DIOXIDE GAS WHEN HEATED IN A FIRE. USE ANY AGENT APPROPRIATE FOR FIRE SITUATION.

IN CASE OF SPILL: WEAR PROPER PROTECTIVE EQUIPMENT. PROMPTLY SWEEP UP WITH MINIMUM DUSTING AND SHOVEL INTO AN EMPTY CONTAINER AND COVER. CAUTIOUSLY SPRAY RESIDUE WITH PLENTY OF WATER. PROVIDE VENTILATION DUE TO TOXIC SULFUR DIOXIDE GAS WHICH WILL BE LIBERATED UPON PRODUCT CONTACT WITH WATER.

STORAGE AND HANDLING: WEAR PROPER PROTECTIVE CLOTHING WHEN HANDLING PRODUCT (SEE PRODUCT SAFETY DATA SHEET). STORE IN A COOL, DRY, WELL VENTILATED PLACE, AWAY FROM ACIDS AND OXIDIZING AGENTS. KEEP CONTAINERS CLOSED.

ATTENTION: EMPTY CONTAINER CONTAINS PRODUCT RESIDUE AND/OR VAPORS. ALL LABEL WARNINGS APPLY TO EMPTY CONTAINER.

IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT CONTACT CHEMTREC 800-424-9300 ANYTIME, DAY OR NIGHT.
F.D.A. RESTRICTIONS ON FOOD USE OF SULFITING AGENTS
NOT FOR USE ON FRUITS AND VEGETABLES SERVED OR SOLD RAW TO CONSUMERS.
NOT FOR USE ON FOODS AND MEATS RECOGNIZED AS SOURCE OF VITAMIN B.
MUST BE DECLARED ON LABEL OF FINISHED FOODS WHERE AMOUNT OF SULFITE IS 10 PPM OR MORE.

## SPECIAL INSTRUCTIONS
## CONTROL OF "BLACK SPOT" ON SHRIMP

Use as 1¼% solution. Stir 3¼ pounds (about 2½ pints) of Sodium Metabisulfite in 30 gallons of fresh clean seawater until dissolved. Use plastic, rubber or plastic lined container of adequate size and a wood or plastic stirrer. Dehead shrimp and place in plastic sieve. Dip in solution and agitate 1 minute. Drain well and pack in ice as usual.

WARNING!
Do Not Use in Dry Form.
Prepare and use dip solution on deck · NOT IN HOLD. Toxic sulfur dioxide gas may be liberated.

# For Manufacturing Use Only

**PELIGRO**

Este producto puede causar irritación de la piel, ojos y vías respiratorias. Contacto prolongado puede producir quemaduras. Peligroso al ingerirse. (puede causar serias reacciones alérgicas en ciertas personas asmáticas).
Reacciona con agua y ácidos produciendo gases tóxicos de anhídrido sulfuroso.

Evítese el contacto con la piel y los ojos.
No debe respirarse el polvo y manipúlese sólo con buena ventilación.
No debe ingerirse.
Evítese contacto con ácidos.
Contacto con agua debe hacerse en condiciones de buena ventilación.

**Primeros Auxilios:**
En caso de contacto: Piel: Lávese inmediatamente con mucha agua y jabón. Ojos: Lávese inmediatamente con mucha agua durante 15 minutos y obténagase atención médica.
En caso de ingestión: Si la persona está conciente, darle de beber inmediatamente 2-4 vasos de agua o leche e inducir el vómito tocando con el dedo la pared posterior de la garganta. Obtener atención médica inmediata.
En caso de inhalación: Trasladar la persona al aire fresco. Ver al médico si hay irritación o cualquier otro síntoma.
En caso de incendio: Usar equipo de protección respiratoria integral.
El producto no arde pero desprende gas anhídrido sulfuroso cuando es calentado al fuego. Usar cualquier agente extinguidor de fuego apropiado a la situación.
En caso de derrame: Usar equipo de protección apropiado. Barrer en seguida evitando levantar polvo y recoger en un recipiente vacío con tapa. Con cuidado, mojar el residuo con mucha agua. Ventilar el ambiente ya que el contacto con el agua produce gases tóxicos de anhídrido sulfuroso.

**Almacenaje y manipuleo:**
Usar ropa protectora apropiada para manipular este producto.
(Ver hoja de información de seguridad).
Almacenar en lugar fresco y seco con buena ventilación, lejos de ácidos y agentes oxidantes. Mantener los recipientes cerrados.

IMPORTANTE: Los recipientes vacíos contienen vapores y/o residuos del producto. Todas las instrucciones de la etiqueta se aplican también a los recipientes vacíos.

En casos de emergencia con este producto llame a CHEMTREC 800-424-9300 a cualquier hora del día o de la noche.

**INSTRUCCIÓN ESPECIAL PARA EL CONTROL DE "MARCAS NEGRAS" EN EL CAMARON**

Use como una solución de 1¼%. Agite 3¼ libras (casi 2½ pintas) de metabisulfito de sodio en 30 galones de agua de mar fresca y limpia hasta que se disuelva. Use una vasija de plástico, de caucho o una forrada con plástico de tamaño adecuado y una varilla agitadora de madera o de plástico. Ponga los camarones decapitados en un cedazo plástico. Sumérgalos en la solución y agítelos por 1 minuto. Dréneos bien y empaquételos en hielo como de costumbre.

CUIDADO!

NO USE EN FORMA SECA. Use este proceso en la cubierta del barco.

NO EN LA BODEGA. Posibilidad de gases tóxicos en este proceso.