

OFFICE *of the* ATTORNEY GENERAL
GREG ABBOTT

January 29, 2003

Mr. Felipe Alanis
Commissioner of Education
Members of the State Board of Education
1701 North Congress Avenue
Austin, Texas 78701-1494

Opinion No. GA-0016

Re: Whether appropriation of additional funds to the Texas Education Agency for payment of internal costs and fees for external management of the assets of the permanent school fund is contingent on the fund producing $150 million in excess of the Comptroller of Public Accounts' estimate in the Biennial Revenue Estimate (RQ-0582-JC)

Dear Commissioner Alanis and Board Members:

On behalf of the State Board of Education, former Chairwoman Grace Shore requested an opinion from this office regarding the relationship between riders 38 and 90 of the 2002-03 biennial appropriation to the Texas Education Agency. Specifically, she asked whether the appropriation of additional funds in rider 38 for fees for external management of the assets of the permanent school fund is contingent, pursuant to rider 90, on the fund producing $150 million in excess of the amount estimated by the Comptroller of Public Accounts in the Biennial Revenue Estimate.[1]

To provide a context for her question, we briefly review the constitutional and statutory provisions with respect to the permanent school fund, the available school fund, the State Board of Education, and the Texas Education Agency.

Article VII, section 2 of the Texas Constitution creates the "perpetual school fund" consisting of "[a]ll funds, lands and other property heretofore set apart and appropriated for the support of public schools . . . and all sums of money that may come to the State from the sale of any portion of the same." TEX. CONST. art. VII, § 2. Article VII, section 5 describes and governs the "permanent school fund" and the available school fund. *See id.* art. VII, § 5. The permanent school fund is described as a "perpetual endowment for the public schools of this state" consisting generally of bonds, dedicated lands, and investment and sale proceeds of those bonds and lands. *See id.* art. VII, § 5(a); TEX. EDUC. CODE ANN. § 43.001(a) (Vernon 1996). The available school fund, which

_____

[1] *See* Letter from the Honorable Grace Shore, Chair, State Board of Education, to the Honorable John Cornyn, Texas Attorney General (July 26, 2002) (on file with Opinion Committee) [hereinafter Request Letter].

generally consists of the income derived from the securities and land in the permanent school fund as well as taxes and appropriations made by the legislature for public school purposes, may be used annually for the support of the public free schools. *See* TEX. CONST. art. VII, § 5(a); TEX. EDUC. CODE ANN. § 43.001(a) (Vernon 1996). Except as provided by article VII, section 5, the legislature may not appropriate any part of the permanent school fund or the available school fund for any other purpose. *See* TEX. CONST. art. VII, § 5(a). Section 5(c) of article VII permits the legislature to appropriate part of the available school fund for administration of the permanent school fund. *See id.* art. VII, § 5(c).

The State Board of Education (the "Board") manages the assets of the permanent school fund. The Board is a state agency that the constitution requires the legislature to create with "such duties as may be prescribed by law." *Id.* art. VII, § 8. The Board is authorized to "invest the permanent school fund within the limits of the authority granted by Section 5, Article VII, Texas Constitution, and Chapter 43" of the Education Code. TEX. EDUC. CODE ANN. § 7.102(c)(31) (Vernon Supp. 2003); *see also* TEX. CONST. art. VII, § 5(d) (in managing assets of permanent school fund, Board to acquire and sell investments that person of ordinary prudence would acquire or retain); TEX. EDUC. CODE ANN. § 43.003 (Vernon 1996) (types of securities in which Board may invest permanent school fund). In managing the permanent school fund, the Board is required to "develop written investment objectives concerning the investment of the . . . fund[,]" which "may address desired rates of return, risks involved, investment time frames, and any other relevant considerations." TEX. EDUC. CODE ANN. § 43.004(a) (Vernon 1996). And the Board is authorized to contract with private investment managers to assist the Board in investing the fund. *See id.* § 43.005(a).

The legislature has, for the past two bienniums, appropriated to the Texas Education Agency (the "TEA") available school funds to manage the state school finance system and increase the value and return from the permanent school fund. *See* General Appropriations Act, 77th Leg., R.S., S.B. 1, art. III (III-6); General Appropriations Act, 76th Leg., R.S., H.B. 1, art. III. The Commissioner of Education (the "Commissioner") and agency staff comprise the TEA. *See* TEX. EDUC. CODE ANN. § 7.002 (Vernon 1996). The Commissioner serves as the executive officer of the TEA and the executive secretary of the Board, *see id.* § 7.055 (b)(2) (Vernon Supp. 2003), and carries out the duties imposed by the Board and the legislature, *see id.* § 7.055(b)(3). Among other legislatively imposed duties, the Commissioner must implement and administer the state's school finance system, *i.e.,* the Foundation School Program. *See id.* §§ 7.055(b)(35), 42.004 (Vernon 1996). The Foundation School Program, generally speaking, consists of school district funding components or "tiers" to provide for a basic educational program; for substantially equal access to funds to provide an enriched educational program above the basic level; and for educational facilities. *See id.* § 42.002(b) (Vernon Supp. 2003). The cost of the Foundation School Program is financed with local school district taxes, state appropriations, and available school fund distributions. *See id.* § 42.251.

The current appropriation to the TEA appropriates a sum of money in each year of the biennium for the management of the Foundation School Program and the permanent school fund, including amounts that may be expended for external management expenses:

**C.1.2. Strategy:** SCHOOL FINANCE SYSTEM OPERATIONS
Efficiently manage the Foundation School Program and increase the principal value of the Permanent School Fund and the annual rate of deposit to the Available School Fund.

. . . .

**Efficiencies:**

. . . .

Percent Market Value Expended on External Management Expenses

*See* General Appropriations Act, 77th Leg., R.S., S.B. 1, art. III (III-6).

Rider 38 to the TEA' s appropriation appropriates additional amounts to Strategy C.1.2 for the 2002-03 biennium for payment of internal costs and external management fees of the permanent school fund if income from the fund exceeds the Comptroller of Public Account's (the "Comptroller") estimate for the biennium:

> **Permanent School Fund: External Management Fees.** *Contingent* on the State Board of Education *adopting asset allocation and investment policies* for the Permanent School Fund *that produce income* to the Available School Fund *for* support of appropriations above for Strategies A.2.1, FSP - Equalized Operations and C.1.2, School Finance System Operations, *in excess of the amounts estimated* in the Biennial Revenue Estimate prepared by the Comptroller of Public Accounts for the 2002-03 biennium,[2] *additional income projected* by the Board for the Available School Fund from Permanent School Fund investments *is appropriated to Strategy C.1.2, School Finance System Operations, for expenditure for internal costs and fees for external management of Permanent School Fund assets.*
>
> The additional amounts appropriated for external management costs may not exceed .5 percent of market value of funds placed with external managers and may not be transferred to any other strategy within Goal C, Texas Education Agency Operations, or to Goal D, Indirect Administration. The amounts appropriated shall be made available for expenditure on a quarterly basis. Appropriations for

---

[2]*See* TEX. EDUC. CODE ANN. § 43.014 (Vernon Supp. 2003) (directing the Comptroller each year to estimate amount of available school fund receivable and report to Board and, before legislative session, directing Comptroller to report to legislature estimate of available school fund to be received for following two years and that is subject to appropriation for public schools).

> external management costs may only be expended if the Board awards contracts for external management services on an open, formal request for proposal process which gives consideration to both performance and price.

*See id.* art. III (III-14) (emphasis and footnote added).

Finally, rider 90 to the TEA's appropriation requires the Board to provide to the Comptroller a "memorandum of commitment" indicating that the Board's changed permanent school fund investment strategy will produce an additional $150 million in excess of the Comptroller's income estimate for the 2002-03 biennium:

> **Available School Fund.** The State Board of Education shall provide to the Comptroller of Public Accounts *a memorandum of commitment indicating that changes in the Permanent School Fund investment strategy will result in an additional $150,000,000* in the 2002-03 biennium *over the Comptroller's official estimate* of Permanent School Fund interest, dividend, and other revenue earnings as reported in the 2002-03 Biennial Revenue Estimate or, if applicable, in the latest succeeding official revenue estimate issued by the Comptroller prior to the date of the agreement.

*See id.* art. III (III-24) (emphasis added).

Former Chairwoman Shore informed us that the Board has adopted a specific investment asset allocation policy to manage the assets of the permanent school fund and produce adequate revenues for distribution to the public free schools through the available school fund. *See* Request Letter, *supra* note 1, at 1. "This policy determines both the investment strategies and asset allocations to external investment managers . . . ." *Id.* The Board, we understand, has entered into contracts for the biennium with external investment managers for the investment of the assets allocated to those managers, relying on the amounts appropriated in rider 38 for payments of such contracts for the 2002-03 period. However, the TEA staff, which "[i]n providing administrative services to the [Board] . . . certifies and forwards invoices to the Comptroller for payment" has stated "that the funds appropriated in Rider 38 are unavailable for expenditure" as authorized by the Board for payment of these external management services. *Id.* at 4. The TEA staff asserts "that the additional income goal mentioned in Rider 90 . . . must be met before funds can be expended as appropriated in Rider 38." *Id.* at 1.[3] That goal will not be met because, as we understand it, although

---

[3]*See also* letters attached to Request Letter, *supra* note 1, from the Honorable Carole Keeton Rylander, Texas Comptroller of Public Accounts, to the Honorable Grace Shore, Chair, State Board of Education (April 15, 2002) ("[M]y office would not issue warrants–to expend state funds under Rider 38 for additional fees for management of the Permanent School Fund[.]"); from the Honorable Carole Keeton Rylander, Texas Comptroller of Public Accounts, to the Honorable Rodney G. Ellis, Chair, Senate Committee on Finance, and the Honorable Robert A. Junell, Chair, House Committee on Appropriations (April 12, 2002) ("Before Rider 38's additional fees can be paid, the revenues need to
(continued...)

projected revenues from the permanent school fund will exceed the Comptroller's estimate in the 2002-03 Biennial Revenue Estimate, they will not exceed the estimate by $150 million. *See id.* at 1, 4.

Former Chairwoman Shore asked: "Does Rider 90 require that the [permanent school fund] produce an additional $150,000,000; or does Rider 90 require that the [Board] provide a memorandum of commitment to the Comptroller of Public Accounts?" *Id.* at 4. She also asked: "Is the expenditure of funds appropriated in Rider 38 contingent on the [permanent school fund] producing the $150,000,000 identified in Rider 90?" *Id.*

We conclude that rider 90, by its terms, merely requires the Board to provide a memorandum of commitment. Rules applicable to the construction of statutes also apply to the construction of items of appropriations and riders.[4] *Cf. Jessen Assocs. v. Bullock*, 531 S.W.2d 593, 599-600 (Tex. 1976); Tex. Att'y Gen. Op. No. M-1207 (1972) at 3. In construing a statute, we attempt to give effect to the legislature's intent. *See Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 438 (Tex. 1997). To do that, we construe a statute according to its plain language. *See RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607-08 (Tex. 1985). We read words and phrases in context and construe them according to rules of grammar and common usage. *See* TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1998) (Code Construction Act). Rider 90 requires the Board to "provide to the Comptroller of Public Accounts *a memorandum of commitment indicating* that changes in the Permanent School Fund investment strategy will result in an additional $150,000,000 in the 2002-03 biennium over the Comptroller's official estimate." *See* General Appropriations Act, 77th Leg., R.S., S.B. 1, art. III (III-24) (emphasis added). This language plainly requires the Board to provide a memorandum of commitment. It does not require the permanent school fund to produce the additional income.

Furthermore, even assuming that rider 90 required the permanent school fund to produce additional $150 million income in excess of the Comptroller's estimate, neither that rider nor rider 38 makes the rider 38 appropriation contingent on this result.

---

[3](...continued)
cover all budgeted amounts, including the $150 million required by Rider 90."); from the Honorable Rodney Ellis, Chair, Senate Committee on Finance, and the Honorable Robert A. Junell, Chair, House Committee on Appropriations, to the Honorable Bill Ratliff, Texas Lieutenant Governor, the Honorable James E. "Pete" Laney, Speaker of the House, and to the Honorable Carole Keeton Rylander, Texas Comptroller of Public Accounts (April 11, 2002) ("There is no question it was our intent that the two riders should be read together. The Biennial Revenue Estimate plus the additional $150 million in income, as called for in Rider 90, must be met prior to the agency expending state funds under Rider 38 for external fund mangers.") (on file with Opinion Committee).

[4]An "item of appropriation" sets aside or dedicates funds for a specified purpose. *See Jessen Assocs. v. Bullock*, 531 S.W.2d 593, 599 (Tex. 1976). A "rider" may detail, limit, or restrict the use of funds appropriated elsewhere in the act or may otherwise insure that money is spent for the purpose for which it is appropriated. *See* Tex. Att'y Gen. Op. No. V-1254 (1951) at 17; *see also Strake v. Court of Appeals*, 704 S.W.2d 746, 748 (Tex. 1986) (rider to appropriations act must relate to appropriations of funds; rider dealing with different subject is general law and may not be included in the appropriations act).

Rider 38 does not condition, by its terms, the appropriation of excess projected funds on the permanent school fund producing $150 million over the Comptroller's estimate. *See RepublicBank Dallas, N.A.*, 691 S.W.2d at 607-08 (statute to be construed according to its plain language); TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1998) (Code Construction Act) (statutory language to be read in context and construed according to rules of grammar and common usage). Rider 38 specifically appropriates additional income produced from the permanent school fund for external management fees. This appropriation is contingent only on the Board adopting asset allocation and investment policies for the permanent school fund that produce income to the available school fund for support of the Foundation School Program and School Finance System Operations "in excess of the amounts estimated in the Biennial Revenue Estimate" by the Comptroller. General Appropriations Act, 77th Leg., R.S., S.B. 1, art. III (III-14).

Nor does rider 90 restrict, by reference or otherwise, the rider 38 appropriation for external management fees. Rider 90 does not condition the rider 38 appropriation on the permanent school fund producing $150 million over the Comptroller's estimate. *See id.* art. III (III-24). It makes no reference to rider 38. *See id.*

Finally, where the language of a statute is clear, as we believe the language of riders 38 and 90 is, we need not look to extrinsic aids such as legislative history to determine the legislature's intent. *See Fitzgerald v. Advanced Spine Fixation*, 996 S.W.2d 864, 865 (Tex. 1999); *Fleming Foods v. Rylander*, 6 S.W.3d 278, 282 (Tex. 1999); *Boykin v. State*, 818 S.W.2d 782, 785-86 (Tex. Crim. App. 1991) (en banc); *see also Cent. Counties Ctr. for Mental Health & Mental Retardation Servs. v. Rodriguez*, 45 S.W.3d 707, 713 (Tex. App.–Austin 2001, pet. filed) ("Sources of legislative history in Texas are notoriously incomplete and unreliable. . . . Because the legislature has spoken clearly, we will look no further than the statute itself."). Moreover, if the language of the riders was ambiguous, justifying the use of legislative history as an extrinsic aid, we would consider only "actions taken and statements made during legislative consideration." *Lee v. Mitchell*, 23 S.W.3d 209, 213 (Tex. App.–Dallas 2000, pet. denied) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 123 (Tex. 1998) (considering, as legislative history, floor debates, committee hearing, and bill analyses)). Because letters by legislators that attempt to explain the intent of a bill after it was passed "'are not statutory history, and can provide little guidance as to what the legislature collectively intended,'" *In re Doe*, 19 S.W.3d 346, 352 (Tex. 2000), they cannot be meaningfully considered, *id.* ("'courts construing statutory language should give little weight to post-enactment statements by legislators'") (citation omitted); *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex. 1993) (after bill is enacted, "the intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute"); Tex. Att'y Gen. Op. No. JC-0567 (2002) at 7 ("statements proffered by individual legislators after a statute has been enacted do not constitute 'legislative history'"); *see also In re Doe*, 19 S.W.3d at 354 (a court "can only apply an interpretation that comports with the statute's existing plain language, structure, and legislative history. If the Legislature, as a body, agrees [that the court misunderstood its] intent, it is the Legislature's prerogative to amend the statute. . . . This is precisely how the separation of powers doctrine should work."). If the legislature as a body had intended the rider 38 appropriation to be contingent on the fund producing $150 million in excess of the Comptroller's estimate, that intent could have easily been stated in one of the two riders.

Former Chairwoman Shore next asked : "Can the TEA refuse to follow the directions of the [Board], toward fulfilling the Board's constitutional and legal obligations, to facilitate the expenditure of funds appropriated therefor?" Request Letter, *supra* note 1, at 6. Given our conclusion that the appropriation in rider 38 is not contingent on the permanent school fund producing $150 million over the Comptroller's estimate, we do not address this question.

While her question is very general, the discussion in her letter indicates that her concern is limited to the TEA staff's assertion that additional appropriations from rider 38 are unavailable to pay external management services contracts. *See id.* at 1, 4-5. The TEA's assertion has practical consequences because the rider 38 funds are appropriated to the TEA. *See* General Appropriations Act, 77th Leg., R.S., S.B. 1, art. III (III-14). The Commissioner is required by statute to examine and approve "any account to be paid out of the school funds before the comptroller may issue a warrant." TEX. EDUC. CODE ANN. § 7.055(b)(7) (Vernon Supp. 2003).

The TEA's position is premised on the legal view that the rider 38 appropriation is contingent on the permanent school fund producing $150 million over the Comptroller's estimate. *See* Request Letter, *supra* note 1, at 1.[5] Given that the permanent school fund is not projected to produce an excess $150 million in income, the TEA concludes that there are no authorized appropriations with which to pay the external management contracts. *See* TEA Letter, *supra* note 5, at 1-2; *see also* TEX. CONST. art. VIII, § 6 ("No money shall be withdrawn from the Treasury but in pursuance of specific appropriations made by law."); *id.* art. VII, § 5(c) ("The legislature may appropriate part of available school fund for administration of the permanent school fund . . . ."); Tex. Att'y Gen. Op. No. DM-316 (1995) at 2 (article VII, § 5(c) requires express legislative appropriation); General Appropriations Act, 77th Leg., R.S., S.B. 1, art. IX, § 6.04(a) ("An agency specified in this Act may not incur an obligation in excess of the amounts appropriated to it for the respective objects or purposes named."). We have concluded, however, that rider 38 is not contingent on the permanent school fund producing $150 million in excess of the Comptroller's estimate. The TEA informs us that "[s]hould [the Office of the Attorney General] determine that additional funds are available under Rider 38, we will of course commit those funds as directed by the Board." TEA Letter, *supra* note 5, at 2.

---

[5]*See also* letter from David Anderson, General Counsel, Texas Education Agency, to the Honorable John Cornyn, Texas Attorney General (Sept. 12, 2002) (on file with Opinion Committee) [hereinafter TEA Letter].

## S U M M A R Y

Appropriation of additional funds to the Texas Education Agency in the 2002-03 biennium for payment of fees for external management of the assets of the permanent school fund under rider 38 is not contingent, pursuant to rider 90, on the fund's producing $150 million in excess of the amount estimated by the Comptroller of Public Accounts in the Biennial Revenue Estimate.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

NANCY S. FULLER
Deputy Attorney General - General Counsel

RICK GILPIN
Deputy Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee