COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-258-CV
  
  
W. RAY IRVIN, JR.                                                                APPELLANT
 
V.
 
LORETTA PARKER                                                                    APPELLEE
 
  
------------
 
FROM COUNTY COURT AT LAW NO. 1 
OF WICHITA COUNTY
 
------------
 
OPINION
 
------------
        This 
case involves a property dispute between Appellee Loretta Parker, the sister of 
Noma Bishop Irvin, deceased, in her capacity as the administratrix of Noma’s 
estate, and Appellant Ray Irvin, Noma’s widower. Ray appeals the portion of 
the trial court’s judgment ordering Prudential Insurance Company of America to 
turn over to Loretta the proceeds of an annuity purchased during Ray and 
Noma’s marriage. In four issues, Ray asserts that the evidence is legally and 
factually insufficient to support the jury’s finding that the Prudential 
annuity was purchased with Noma’s separate property funds, and he argues that 
the trial court erred in admitting a prior pleading as an admission against 
interest and in charging the jury with respect to the abandoned pleading.  
We affirm in part and reverse and remand in part.
I. FACTUAL AND PROCEDURAL BACKGROUND
        Noma 
owned and inherited substantial property when her first husband Garland Bishop 
died in 1965. Noma later married Ray in 1968 and remained married to him until 
her death in May 1998. At the time of Noma’s death, her will named her 
brother-in-law, Bobby Joe Parker as the executor, but it did not name an 
alternate executor. But because Bobby Joe Parker had died in 1993, Noma’s 
sister, Loretta, applied to be the administratrix of Noma’s estate when Noma 
died. On July 28, 1998, the trial court signed an order admitting Noma’s will 
to probate and appointing Loretta as the will’s administratrix.
        Under 
the terms of Noma’s will, her estate passed to Loretta, Loretta’s siblings, 
and Loretta’s children. On December 11, 1998, Loretta filed a petition to 
recover property belonging to Noma’s estate and requested, among other things, 
that Ray return two certificates of deposit totaling $70,000 and $75,000 that 
Loretta alleged were Noma’s separate property.  Through discovery, 
Loretta determined that the $75,000 had been used to purchase an annuity from 
Prudential. On October 18, 1999, Loretta filed a petition against Ray and 
Prudential, asserting that Ray had taken $75,000 of Noma’s separate property, 
purchased an annuity from Prudential in 1996, made himself the owner of the 
annuity, and thereby converted Noma’s separate property.
        On 
December 17, 2001, Ray, Loretta, and Prudential signed an agreement regarding 
the annuity issued to Ray in 1996. Prudential acknowledged that although Ray 
claimed he was entitled to the proceeds of the annuity, Loretta likewise claimed 
that she was entitled to the annuity because she alleged that the annuity was 
purchased with Noma’s separate property.  The parties agreed that the 
claims were adverse and conflicting and would be determined in the pending 
lawsuit. Prudential further agreed to freeze the annuity and to distribute the 
annuity and its proceeds only when presented with the trial court’s final 
determination of who was entitled to the funds from the annuity. Loretta then 
nonsuited Prudential, and Loretta and Ray agreed not to name Prudential as a 
defendant in the pending lawsuit.
        In 
February 2002, Loretta tried her case against Ray. During trial, Loretta offered 
evidence that on October 18, 1993, Noma and Ray opened AmWest Savings 
Association account number 11-136970-0 with a $75,000 deposit. The name on the 
account was “W. Ray Irvin, Jr. or Noma G. Irvin, Trustees for Loretta 
Parker.” Thomas Barber, who is a certified public accountant, testified for 
Loretta as a tracing expert and stated that the account was set up as a 
revocable trust. Barber testified that, on October 19, 1994, Ray withdrew 
$75,006.98 from AmWest Account No. 11-136970-0 by obtaining a check made payable 
to “W RAY IRVIN JR OR NOMA G IRVIN TRUSTEES FOR LORETTA PARKER.”
        On 
the same day, Noma and Ray opened account number 132700348 at Guaranty Federal 
Bank, and it was also named “W RAY IRVIN OR NOMA G IRVIN ITF LORETTA 
PARKER.” Barber testified that five days later, on October 24, Ray deposited 
$75,000 in the Guaranty Federal account. Then, on January 24, 1996, Ray withdrew 
$75,046.24 from the Guaranty Federal account and purchased the annuity at issue 
from Prudential Insurance Company.
        Purdom 
Keeling, the Prudential representative who sold Noma and Ray the annuity, 
testified that he primarily worked with Ray in persuading them to purchase the 
annuity. Keeling testified that when he sold the annuity, Noma pulled out the 
checkbook, and Ray signed the check.[1]  The 
Prudential annuity listed Noma and Ray as co-annuitants, Ray as the sole owner 
of the annuity, and Loretta as the beneficiary, if living, and Ray’s estate as 
the alternate beneficiary.
        Ray 
testified that he and Noma received $500 a month from the Prudential 
annuity.  Ray stated that shortly after Noma’s death, the Prudential 
annuity was garnished, and he was “not getting any good out of it.”  
While he offered no testimony as to the present value of the Prudential annuity 
at the time of trial, in a portion of Ray’s deposition that was read to the 
jury, Ray estimated the present value of the annuity on February 9, 1999 to be 
approximately $70,000.
        As 
we discuss more fully below, Loretta and Ray presented competing evidence and 
arguments as to the origin of the purchase money for the Prudential annuity. 
Loretta attempted to trace the $75,000 purchase money back to Noma’s separate 
property while Ray offered evidence to suggest that Loretta could not trace the 
funds back to Noma’s separate property and that the purchase money was 
presumed to have come from the couple’s community estate.
        After 
considering all of the evidence and testimony before it, the jury answered 
Question One as follows: 
 
        Do 
you find from clear and convincing evidence, that the Prudential Annuity was 
purchased with separate property funds of Noma Bishop Irvin?
        Answer: 
Yes.
 
The jury also determined that 
Noma did not knowingly consent to Ray being the owner of the Prudential annuity 
on the date of purchase.  Based on these findings, the trial court signed a 
judgment ordering Prudential to turn over the proceeds of the annuity to 
Noma’s estate.[2]
II. ABANDONED PLEADING
        Before 
turning to Ray’s sufficiency complaints, we will address his fourth issue 
concerning whether the trial court erred in admitting a prior pleading as an 
admission against interest and by charging the jury on the admission in the 
abandoned pleading.  In Ray’s response to Loretta’s petition to recover 
estate property, Ray pleaded, “The C.D. which appears to have been the 
separate property of Noma was used to purchased [sic] a Prudential annuity (copy 
attached).”
        When 
Loretta offered the abandoned pleading at trial, the court conducted a bench 
conference concerning its admissibility. At the conclusion of the conference, 
both sides agreed that the abandoned pleading was admissible for a limited 
purpose, and Ray stated that he had ”[n]o objection” to the abandoned 
pleading’s admission. See generally Long v. Knox, 155 Tex. 581, 
291 S.W.2d 292, 294 (1956) (“[A]n admission against interest in an abandoned 
pleading may be used in evidence against the pleader, but is not conclusive.” 
); Kirk v. Head, 137 Tex. 44, 152 S.W.2d 726, 729 (1941); Hughes v. 
Fort Worth Nat’l Bank, 164 S.W.2d 231, 232 (Tex. Civ. App.—Fort Worth 
1942, writ ref’d).  Because Ray withdrew his objection to the 
admissibility of the abandoned pleading and therefore did not obtain a ruling 
from the trial court concerning the issue that he now raises on appeal, we 
conclude that Ray waived his complaint concerning the admissibility of his 
abandoned pleading.[3]  Tex. R. App. P. 33.1(a); see also 
Tex. R. Evid. 103(a)(1); Bushell 
v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g).
        Further, 
we hold that Ray failed to preserve any error with respect to the abandoned 
pleading jury instruction because he did not object to the charge concerning 
that instruction.  See Tex. 
R. Civ. P. 274 (“Any complaint as to a question, definition, or 
instruction, on account of any defect, omission, or fault in pleading, is waived 
unless specifically included in the objections.”); State Dep’t of 
Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 239-41 (Tex. 1992); Wilgus 
v. Bond, 730 S.W.2d 670, 672 (Tex. 1987).  Accordingly, we overrule 
issue four.
III. SUFFICIENCY OF THE EVIDENCE
        In 
his first three issues, Ray challenges the legal and factual sufficiency of the 
evidence to support the jury’s finding in question one that the Prudential 
annuity was purchased with Noma’s separate property funds.  Specifically, 
Ray maintains that Loretta failed to trace the money used to purchase the 
annuity back to Noma’s separate property and thereby failed to overcome the 
presumption that, at the time of Noma’s death, the Prudential annuity was 
included in the community estate.  See Tex. Fam. Code Ann. § 3.003(a) (Vernon 
1998).  We agree.
        A.     Characterization 
of Property
        Property 
possessed by either spouse during or on the dissolution of marriage is presumed 
to be community property.  Id.; Boyd v. Boyd, 131 S.W.3d 605, 
612 (Tex. App.—Fort Worth 2004, no pet.); Evans v. Evans, 14 S.W.3d 
343, 346 (Tex. App.—Houston [ 14th Dist.] 2000, no pet.).  
This presumption applies not only to dissolution by divorce, but also by 
death.  Lee v. Lee, 43 S.W.3d 636, 641 (Tex. App.—Fort Worth 2001, 
no pet.); Evans, 14 S.W.3d at 346; Smith v. Lanier, 998 S.W.2d 
324, 331 (Tex. App.—Austin 1999, pet. denied).  To overcome this 
presumption, a party claiming certain property as separate property must 
establish by clear and convincing evidence the separate character of the 
property through tracing.  Tex. Fam. 
Code Ann. § 3.003(b); Boyd, 131 S.W.3d at 612 (citing McElwee 
v. McElwee, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 
1995, writ denied)); Evans, 14 S.W.3d at 346.
        Separate 
property will retain its character though a series of exchanges so long as the 
party asserting separate ownership can overcome the community presumption by 
tracing the assets on hand during the marriage back to property that, because of 
its time and manner of acquisition, is separate in character. Cockerham v. 
Cockerham, 527 S.W.2d 162, 167 (Tex. 1975); Boyd, 131 S.W.3d at 612 
(“Tracing involves establishing the separate origin of the property through 
evidence showing the time and means by which the spouse originally obtained 
possession of the property.”); Evans, 14 S.W.3d at 346. On the other 
hand, if the evidence shows that separate and community property have become so 
commingled as to defy resegregation and identification, the community 
presumption prevails.  Boyd, 131 S.W.3d at 612.  As a general 
rule, mere testimony that property was purchased with separate funds, without 
any tracing of the funds, is insufficient to rebut the community 
presumption.  Id. (citing Zagorski v. Zagorski, 116 S.W.3d 
309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on 
reh’g)). We resolve any doubt as to the character of property in favor of the 
community estate.  Id. (citing Akin v. Akin, 649 S.W.2d 700, 
703 (Tex. App.—Fort Worth 1983, writ ref’d n.r.e.)).
        While 
the burden of tracing is difficult, it is not an impossible burden to 
sustain.  Id.; Latham v. Allison, 560 S.W.2d 481, 484 (Tex. 
Civ. App.—Fort Worth 1977, writ ref’d n.r.e.).  “Whether the 
presumption as to the community character of marital property is overcome is a 
question for the jury.” Lanier, 998 S.W.2d at 332 (citing Orrill v. 
Orrill, 271 S.W.2d 173, 175-76 (Tex. Civ. App.—Texarkana 1954, no writ)).
        B.     Standards 
of Review
        Because 
the burden of proof at trial was clear and convincing evidence, on appeal we 
apply higher standards of legal and factual sufficiency review than is 
ordinarily employed in civil cases.  Tex. 
Fam. Code Ann. § 3.003(b); In re J.F.C., 96 S.W.3d 256, 265-66 
(Tex. 2002); In re C.H., 89 S.W.3d 17, 25-26 (Tex. 2002); Boyd, 
131 S.W.3d at 611; Zagorski, 116 S.W.3d at 313-14.  In reviewing the 
evidence for legal sufficiency, we must determine “whether the evidence is 
such that a factfinder could reasonably form a firm belief or conviction” that 
the separate property characterization was proven. J.F.C., 96 S.W.3d at 
265-66. We must review all the evidence in the light most favorable to the 
finding and judgment. Id. at 266. This means that we must assume that the 
factfinder resolved any disputed facts in favor of its finding if a reasonable 
factfinder could have done so.  Id. We must also disregard all 
evidence that a reasonable factfinder could have disbelieved.  Id.  
We must consider, however, undisputed evidence even if it does not support the 
finding.  Id.
        C.     Application 
of Law to the Facts
        We 
begin with the presumption that the $75,000 used to purchase the Prudential 
annuity is properly characterized as community property.  See Tex. Fam. Code Ann. § 3.003(a); Boyd, 
131 S.W.3d at 612; Evans, 14 S.W.3d at 346.  Loretta argues that she 
overcame the community presumption by establishing with clear and convincing 
evidence the separate character of the annuity’s funds through tracing.  See 
Tex. Fam. Code Ann. § 3.003(b); Boyd, 
131 S.W.3d at 611-12; Evans, 14 S.W.3d at 346; McElwee, 911 S.W.2d 
at 189.  For the following reasons, we disagree.
        Loretta 
first points out that Ray did not object to the inventory, appraisement, and 
list of claims she filed on behalf of Noma’s estate, and which was approved by 
the trial court, that listed a claim against Ray for $75,000 “for conversion 
of separate property funds of Noma Bishop Irvin which were used by W. Ray Irvin, 
Jr. to purchase [the Prudential annuity].”  She argues that although the 
approval of an inventory and appraisement is not conclusive of the title to the 
property listed in such, it is prima facie proof of that fact. See Krueger v. 
Williams, 163 Tex. 545, 359 S.W.2d 48, 50 (1962); Garner v. Long, 106 
S.W.3d 260, 266 (Tex. App.—Fort Worth 2003, no pet.); see also Robles v. 
Robles, 965 S.W.2d 605, 620-21 (Tex. App.—Houston [1st Dist.] 
1998, pet. denied) (op. on reh’g) (stating that inventory is not conclusive 
evidence of property’s character); Balaban v. Balaban, 712 S.W.2d 775, 
779 (Tex. App.—Houston [1st Dist.] 1986, writ ref’d n.r.e.) 
(stating that “county court cannot change ownership of property by simply 
approving an inventory,” which is not conclusive evidence of title).
        Next, 
Loretta argues that the jury could have considered Ray’s abandoned pleading, 
in which he pleaded in pertinent part: “The C.D. which appears to have been 
the separate property of Noma was used to purchased [sic] a Prudential annuity 
(copy attached).”  We first observe that Ray qualified his admission 
against interest in his abandoned pleading by stating that the Prudential 
annuity was purchased with property that “appear[ed] to have been” Noma’s 
separate property.  Moreover, as we stated above, while an admission 
against interest in an abandoned pleading may be used in evidence against the 
pleader, it is not conclusive of the fact asserted.  See Knox, 
155 Tex. 581, 291 S.W.2d at 294; Kirk, 137 Tex. 44, 152 S.W.2d at 729; Hughes, 
164 S.W.2d at 232.
        Loretta 
also argues that the jury heard Ray repeatedly admit in his deposition that the 
money used to purchase the Prudential annuity was Noma’s.  Loretta 
directs us to portions of Ray’s deposition testimony, in which he was asked 
whose $75,000 was used to buy the annuity, and Ray responded, “It was Noma’s 
money.”  But Ray denied knowing that she had inherited the $75,000 used 
to purchase the Prudential annuity.  Ray stated, “I don’t know about 
inherited,” but said, “It was hers, and that’s acknowledged.”  Even 
assuming that this testimony may be interpreted as referring to the money used 
to purchase the annuity as the same money she inherited, which is not clear, in 
most cases, mere testimony that property was purchased with separate funds, 
without any tracing of the funds, is insufficient to rebut the community 
presumption.  See Schmeltz v. Garey, 49 Tex. 49, 60-61 (Tex. 1878); Boyd, 
131 S.W.3d at 614; Zagorski, 116 S.W.3d at 316; Ganesan v. 
Vallabhaneni, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied); Osorno 
v. Osorno, 76 S.W.3d 509, 512 (Tex. App.—Houston [14th Dist.] 
2002, no pet.); Bahr v. Kohr, 980 S.W.2d 723, 728-29 (Tex. App.—San 
Antonio 1998, no pet.); Robles, 965 S.W.2d at 616; McElwee, 911 
S.W.2d 189; see also Mendoza v. Fid. & Guar. Ins. Underwriters, Inc., 
606 S.W.2d 692, 694 (Tex. 1980) (stating that testimonial declarations which are 
contrary to a party’s position are merely some evidence and generally are not 
conclusive upon the admitter).
        Here, 
we cannot hold that the trial court’s approval of Loretta’s inventory and 
appraisement, the abandoned pleading, and Ray’s testimony collectively 
constitute legally sufficient evidence to rebut the community presumption as 
applied to the funds used to purchase the Prudential annuity.  
Well-established case law requires that the party seeking to rebut the community 
presumption must trace the assets on hand during the marriage back to property 
that, because of its time and manner of acquisition, is separate in character. Cockerham, 
527 S.W.2d at 167; Boyd, 131 S.W.3d at 612.  Thus, taking into 
consideration the approved inventory and appraisement, Ray’s abandoned 
pleading, and his testimony, we must review the evidence to determine whether 
Loretta corroborated these assertions by tracing the funds used to purchase the 
Prudential annuity to Noma’s separate property.
        As 
we detailed above, Loretta’s tracing expert, Thomas Barber, testified about 
AmWest Savings account number 11-136970-0 and used bank records to show how the 
$75,000 in the AmWest account eventually was used to purchase the Prudential 
annuity.[4]  On cross-examination, however, 
Barber conceded that he did not know the source of the $75,000 used to open 
AmWest Savings account number 11-136970-0 in October 1993.  Moreover, 
Barber agreed that he was not able to testify as to “what the nature of that 
property might be.”  Thus, while Loretta’s own tracing expert followed 
the documentary evidence pertaining to AmWest Savings account number 11-136970-0 
after it was created in October 1993, he did not offer any evidence 
tracing the initial $75,000 back to Noma’s separate property.
        In 
her brief, Loretta asks the rhetorical question, “[W]here did the money come 
from to buy the significant assets of Ray and Noma Irvin, including the 
Prudential annuity?” Loretta argues that because Noma never worked outside the 
house during her marriage to Ray, she brought into her marriage with Ray only 
the funds she inherited when her first husband died.  Loretta also argues 
that the evidence at trial demonstrated that Ray “never earned any money so to 
speak of during their marriage[,] [a]nd he did not have any assets of any 
significance.”  Loretta concludes that the “only reasonable 
inference” the jury could draw concerning the $75,000 at issue is that the 
money came from Noma’s separate property.  We reject this contention.
        Loretta 
testified that, over the course of the couple’s thirty-year marriage, Noma 
never worked outside the house but that Ray was involved in the real estate 
business.  Through the testimony of Noma’s and the Garland Bishop 
Estate’s CPA, Jerry Mathis, Loretta established that when Garland Bishop died, 
his and Noma’s combined community property estate was valued at around 
$256,000. Mathis testified that, among other assets, the Garland Bishop Estate 
continued to operate a partnership business through 1988. Mathis, relying on 
income tax returns, testified to various distributions from the Garland Bishop 
Estate made to Noma during her marriage to Ray.  Mathis, however, testified 
that portions of the distributions were principal, and other portions 
constituted income.  For example, in 1986, Noma received a $98,180.77 
distribution. Mathis testified that $11,098.56 was income and the remaining 
$87,082.21 was principal. Mathis produced and testified on only seven income tax 
returns that the Garland Bishop Estate filed during the twenty-three years it 
operated its partnership business. For the other sixteen years, Mathis made 
assumptions as to how much money was distributed.
        Loretta 
testified that the only assets Ray brought into the marriage were an old Pontiac 
and an office building on Tenth Street.  While Ray stated in his deposition 
that until he retired around 1990, he was involved in “[s]ome little real 
estate activity” that was “not much of anything,” at trial Ray testified 
more specifically about the sources of his income during his marriage to 
Noma.  Ray testified that Noma did not receive social security, but he 
earned around $580 a month in social security.  Ray also testified that he 
had a promissory note on a piece of property at 1910 Collins that generated 
roughly $350 a month. Additionally, Ray said he earned $300 a month from 
property at 2417 Tenth Street.  While married to Noma, Ray sold his 
mother’s house on Cedar and personal belongings for $18,000.[5]  
Aside from the purchase price of Ray’s mother’s house, Loretta did not 
dispute any of Ray’s testimony concerning his sources of income during his 
marriage to Noma. See id. (stating that, under a legal sufficiency 
review, we must consider undisputed evidence even if it does not support the 
challenged finding).
        Loretta 
produced no evidence suggesting that Ray and Noma segregated Noma’s separate 
property from the rest of the couple’s money, and the evidence produced 
demonstrates a complete lack of separate treatment of the couple’s property. 
Loretta produced no bank records or documentary evidence showing when all of 
Loretta’s separate funds came into the marriage, how they were segregated from 
the community estate, and whether separate funds were transferred from accounts 
containing both Noma’s separate property and Ray and Noma’s community 
property.  See Bahr, 980 S.W.2d at 729; Anderson v. 
Gilliland, 677 S.W.2d 105, 107 (Tex. App.—Dallas 1984), rev’d on 
other grounds, 684 S.W.2d 673 (Tex. 1985) (affirming court of appeals’s 
holding that separate funds were not properly traced). Further, Loretta produced 
no evidence to corroborate Ray’s testimony as to what type of property was 
used to purchase the Prudential annuity. See Schmeltz, 49 Tex. at 60-61; Boyd, 
131 S.W.3d at 616; Zagorski, 116 S.W.3d at 316; Ganesan, 96 S.W.3d 
at 354; Osorno, 76 S.W.3d at 512; Bahr, 980 S.W.2d at 728-29; Robles, 
965 S.W.2d at 616; McElwee, 911 S.W.2d at 189.  “When tracing 
separate property, it is not enough to show that separate funds could 
have been the source of a subsequent deposit of funds. Such conjecture does not 
constitute sufficient evidence to sustain appellant’s burden of tracing to 
overcome the community property presumption.”  Latham, 560 S.W.2d 
at 485 (emphasis supplied); see McKinley v. McKinley, 496 S.W.2d 540, 
543-44 (Tex. 1973).  In short, based on the evidence before it, the jury 
was left to rely on surmise and speculation to reach the finding that the funds 
used to purchase the Prudential annuity came from Noma’s separate property—a 
leap that is impermissible under the law. See McKinley, 496 S.W.2d at 
543-44; Latham, 560 S.W.2d at 485.
        Loretta 
may have produced some evidence at trial that Noma’s separate property funds 
were used to purchase the Prudential annuity, but this is not enough to 
constitute clear and convincing evidence.  See J.F.C., 96 S.W.3d at 
264-65 (“Requiring only ‘[a]nything more than’ a mere scintilla of 
evidence does not equate to clear and convincing evidence.”).  We have 
carefully reviewed the record, and under the applicable standard of review, 
giving due deference to the jury’s determinations, we conclude that the 
evidence is legally insufficient to establish that the Prudential annuity was 
purchased with Noma’s separate property funds.  See id. at 265-66; 
Boyd, 131 S.W.3d at 611-12.  Accordingly, we sustain Ray’s first 
issue.[6]
IV. CONCLUSION
        Having 
sustained Ray’s first issue, we reverse the trial court’s judgment insofar 
as it orders Prudential to turn over the proceeds of the annuity to Noma’s 
estate.  Because Loretta failed to prove by legally sufficient evidence 
that the Prudential annuity was purchased with funds from Noma’s separate 
property, the community presumption governs the characterization of the 
Prudential annuity.  See Tex. 
Fam. Code Ann. § 3.003(a); Boyd,131 S.W.3d at 612; Evans, 
14 S.W.3d at 346.  We remand the case for a distribution of the Prudential 
annuity and its proceeds in accordance with the terms of Noma’s will 
concerning her one-half community interest.  We affirm the judgment in all 
other respects.
 
 
                                                          ANNE 
GARDNER
                                                          JUSTICE
  
 
PANEL A:   CAYCE, 
C.J.; HOLMAN and GARDNER, JJ.
 
DELIVERED: June 17, 2004


NOTES
1.  
During trial, Loretta offered considerable medical evidence regarding Noma’s 
declining physical and mental health over the last ten years of her life to show 
that she was dependant on her husband and that she did not fully understand her 
financial dealings. But Keeling testified that, in his dealings with Noma, he 
did not see any indication that she was unable to function mentally.
2.  
The trial court’s judgment also disposes of other property, but Ray’s appeal 
concerns only the portion of the judgment pertaining to the Prudential annuity.
3.  
In fact, after Ray’s counsel asked the trial court to explain to the jury the 
circumstances surrounding the limited admissibility of the abandoned pleading, 
Ray’s counsel added to the trial court’s and Loretta’s counsel’s 
explanations, stating in open court, “And I believe, your Honor, that the case 
-- that while that might be admitted, it’s not conclusive evidence.” The 
trial court responded, “Correct.” Thus, even if we determined that Ray did 
not waive any error in the abandoned pleading’s admission, it could be argued 
that Ray invited the error of which he now complains. See Gen. Chem. Corp. v. 
De La Lastra, 852 S.W.2d 916, 920 (Tex. 1993).
4.  
Barber also traced AmWest Savings account number 11-136605-2, which was opened 
on December 13, 1991 with a $70,000 deposit. Barber testified that on December 
21, 1992, Ray withdrew $70,172.37 from AmWest account number 11-136605-2 and 
purchased an annuity from Ford Life Insurance Company, which later became Sun 
America Life Insurance Company. Barber testified that on December 29, 1997, Ray 
received a check totaling $70,007.53 from Sun America payable to Ray and Noma. 
On January 14, 1998, Ray endorsed the $70,007.53 Sun America check and deposited 
it plus an additional $5,000 into account number 189495215 at First American 
Bank. That account was styled “W. Ray Irvin P.O.D. Noma G. Irvin or Loretta 
Parker.” Roughly one month after Noma died in May 1998, Ray changed the First 
American Bank account to “W. Ray Irvin P.O.D. David Paul Irvin,” who is 
Ray’s son. Barber testified that in July 1998 Ray withdrew $55,000.00 and 
$5,000 from another account to purchase a house. Ray later withdrew the balance 
of First American Bank account number 189495215 and purchased a CD at DFW 
Musicians Credit Union. Barber conceded that he did not know the source of the 
funds deposited in AmWest account number 11-136605-2.
5.  
Ray testified that he sold it for $75,000, but under the applicable standard of 
review, we look to the evidence of the buyer’s testimony and the deed showing 
a purchase price of $18,000. See J.F.C., 96 S.W.3d at 266.
6.  
In light of our disposition of Ray’s first issue, we do not address his second 
or third issues. See Tex. R. App. 
P. 47.1 (stating opinion need only address every issue necessary to final 
disposition of the appeal).