

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00044-CV

VICTOR CATALANOTTO                            APPELLANT

V.

MEADOR OLDSMOBILE LLC F/K/A               APPELLEE
MEADOR OLDSMOBILE INC.

-----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In five issues, Appellant Victor Catalanotto appeals the trial court's judgment on the jury's verdict in favor of Appellee Meador Oldsmobile LLC F/K/A Meador Oldsmobile Inc. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

Catalanotto worked for Meador Oldsmobile for over twenty-three years; he worked as the dealership's general manager for the last twelve or thirteen of those years. Catalanotto sued Meador Oldsmobile for breach of contract, specifically, his entitlement to around $75,000 in severance pay,[2] after the dealership closed.

## A. Background

Before Moorman Meador, Meador Oldsmobile's president and owner, became physically unable to run the dealership, General Motors announced that it would stop producing Oldsmobiles. Moorman put everything into a revocable trust while he sought alternatives to the dealership's demise and named Taylor Gandy and Max Spillar co-trustees. Gandy, executor of the Moorman Meador Estate,[3] was personally involved in running Meador Oldsmobile from November 18, 2002, to January 2005. Until Spillar died, Spillar was co-trustee and then co-executor of Moorman's estate with Gandy. Moorman's trust terminated upon his death on October 9, 2003, and funded his estate.[4] When Moorman died,

---

[2]The other defendants were dismissed, and Catalanotto's other claims resolved, prior to submission of the charge to the jury.

[3]At the time of trial, Gandy was president of a real estate investment company. He was also an attorney, although he had not practiced law since 1992, and an accountant, although he also no longer practiced accounting. Gandy met Moorman Meador in 1963.

[4]Meador Oldsmobile, Inc.'s assets were transferred to Meador Oldsmobile L.L.C.; the Meador Estate owns the L.L.C.

Catalanotto became the dealership's dealer-approved principal, a General Motors dealership operation requirement.

Moorman acquired a letter of intent for a new Dodge dealership and had several discussions with Catalanotto about it; they wanted to keep the existing group of employees together.[5]  However, on November 18, 2002, Gandy and Spillar called Catalanotto into Moorman's office.  They explained that they were cancelling Moorman's plans for the new Dodge dealership and taking over the dealership operations and Moorman's assets because Moorman's health was failing, and they asked Catalanotto to stay and run the dealership.  In October 2004, the dealership began losing money; the end of December 2004 became the target date to finish winding down the business.

## B.  Evidence

Gandy and Catalanotto testified in person.  Spillar testified by deposition, as did his wife Greta, who had worked for Moorman since before Meador Oldsmobile opened on December 1, 1957.  Several documents were admitted in evidence.

### 1.  February 21, 2003 Compensation Agreement

Plaintiff's Exhibit 1, a letter agreement between Catalanotto and Moorman Meador Revocable Trust signed by Catalanotto, Gandy, and Spillar, and dated February 21, 2003, set out the following:

---

[5]As late as the fourth quarter of 2004, Catalanotto kept looking for a new dealership for the employees.

3

This letter will confirm in writing the agreement that was made with you at a meeting at Meador Oldsmobile on November 18, 2002 with Taylor Gandy, Max Spillar, Moorman Meador and you.

We requested that you remain as the General Manager of Meador Oldsmobile, Inc. through the time 1.) that General Motors no longer furnishes us new cars and Meador Olds discontinues operations as a result or 2.) the stockholders of Meador Olds determine to discontinue operations, whichever event occurs first. You have indicated your willingness to make this commitment. Your duties and responsibilities would continue to be the same as they have been in the past devoting your full time and attention to managing the dealership to achieve maximum results consistent with prior policies. Your full time would be expected and you would report to us or to our successors.

During this remaining time at Meador Oldsmobile you will be compensated at the same level using the same bonus formula as you have received in the past.[6] However, your compensation will not drop below $12,000 in any one month or $150,000 per year even if the formula should produce a lower compensation because of the lower volume of new car sales during the remaining time.

In addition we agree that if you complete your commitment to Meador Oldsmobile, Inc. as outlined above and remain until operations have ceased, Meador Oldsmobile, Inc. [w]ill pay you a bonus of $150,000, payable in a lump sum upon cessation of operations by the dealership.

Your salary and bonus as outlined above would be earned only upon your carrying out the policies of the Company as we may determine from time to time. If you are discharged for just cause, your salary beyond such date and your bonus would not be due and payable. The commitments in this letter made by each of us will not be binding on either of us unless General Motors has ceased production of new cars no longer than December 31, 2004.

---

[6]Catalanotto's pay formula was a complex arrangement of $1,000 per month as salary, $80 per used car sold retail, 4.75% of the dealership's net profits, and 7% of net profits from a used car lot affiliated with the dealership, among other benefits.

4

## 2. November 4, 2004 Severance Pay Memo

Plaintiff's Exhibit 2 was a November 4, 2004 memorandum addressed to "All Employees of Meador Oldsmobile, Inc." from "Executors[] of Meador's Estate" regarding "Severance Pay." Defendant's Exhibit 4, containing the same document, included the email to which the memo was attached, also dated November 4, 2004, sent by Gandy to Spillar and Catalanotto. It states, "Here is a draft of the proposed memo to the employee's. [sic] Let me have your comments." The memo set out the following:

> This memo is intended to confirm to each of you the severance pay plan the General Manager presented to you on October 21, 2004.
>
> For those of you that continue working at Meador Olds performing your assigned duties until such date as determined by the General Manager that your services are no longer needed, you will receive severance pay according to the following formula:[7]
>
> . . . .
>
> On behalf of Mr. Meador's Estate we would like to express our appreciation for your many contributions over the years. The discontinuance of the Oldsmobile Division of General Motors more than the death of Mr. Meador has resulted in the closing of Meador Olds.
>
> As we wind down the business of the Company your valuable service will continue to be important to the final days of the

---

[7]The memo's eight paragraphs about severance calculation set out that the amount per employee would be determined by taking the greater amount of annual pay from 2003 or 2004, dividing the amount by fifty-two, and then multiplying it by years of service. The memo also states that employees who left before being asked to would not be eligible to participate in the plan.

Company. If you have any questions, please see the General Manager for clarification.

### 3. Max Spillar's Calculations

The final document, offered by both parties, was a set of calculations by Spillar on a printout showing the hire date, 2003 earnings, and 2004 earnings for thirty-one individuals. There were handwritten calculations beside the names of the employees, showing what each "would get applying the bonus to them." Spillar had drawn lines through Catalanotto's earnings,[8] and there was no handwritten amount of severance by Catalanotto's name.

### 4. Taylor Gandy's Testimony

Gandy described the company's chain of command as employees reporting to managers, who reported to the general manager (Catalanotto), who reported to Gandy and Spillar. He, Catalanotto, and Spillar had regular meetings. Gandy stated that neither he nor Spillar had any experience running a car dealership and that the February 21, 2003 compensation agreement's main purpose was to keep Catalanotto—who was key to the business's continued profitability—at the dealership. With its extra $150,000 and salary floor added to Catalanotto's existing pay, the agreement was set up to ensure that Catalanotto would stay until the dealership stopped receiving Oldsmobiles—that is, "[t]o ensure that Victor [didn't] get another job and leave us high and dry." Gandy

---

[8]Spillar had also drawn lines through the names of three individuals not involved here and through each line item associated with their names, and he did not write an amount of severance pay for them.

6

stated that the idea of a minimum level of compensation was Catalanotto's. Gandy acknowledged that, at the time the compensation agreement was signed, there was no plan for severance for any of the employees.

Sometime before October 21, 2004, Gandy, Spillar, and Catalanotto discussed a severance plan for the employees; Catalanotto was involved in the severance plan's creation from the beginning. The three men devised and developed it over "quite a few different meetings" and over many weeks, and its main purposes were "to incentivize the employees to stay and continue working for Victor in a new dealership if he got one." Additionally, taking care of the employees was something Meador would have wanted, and the plan was a reward for longevity with the company.

Catalanotto called a meeting on October 21, 2004, and presented the severance plan to the employees. Gandy stated that he and Spillar had not discussed when Catalanotto was going to make the announcement and that Catalanotto made the announcement without Gandy knowing. While Catalanotto had the authority to do this, Gandy wished it had been done differently because he had wanted to be present and he assumed, but did not know, that Catalanotto had told the employees about the severance plan like they had discussed. To avoid any misunderstandings about the severance arrangements, Gandy drafted the November 4, 2004 memo. Gandy sent an email to Catalanotto and Spillar with the draft memo attached and asked for their comments, and Catalanotto called him and told him to add a sentence about "if you're terminated for just

7

cause you're not going to receive severance." The draft was never finalized or given to the employees.[9] Gandy agreed that the actual severance agreement with the employees was entered into on October 21, 2004.

Gandy stated that when he addressed the memo to "all employees," he did not intend to include Catalanotto as an employee "because the three of us had devised that plan, and it was never our intention—and I don't think it was Victor's intention—that he be included in that plan." He did not consider Catalanotto an employee for purposes of the memo, although he acknowledged that it could be read either way. Specifically, he explained that in the last paragraph of the November 4, 2004 memo, "you" was a reference to all of the employees except Catalanotto, because Catalanotto was the general manager and was in a different category, even though he was also an employee.

Gandy admitted that he never told Catalanotto "in so many words" that he would not be eligible for the severance plan, and he stated, "I should have said something different than I did in the memo. It was just a draft. But I don't think I misled anybody, including Victor." Catalanotto "well knew that he was not intended to be included" in the severance plan "because of the many hours of discussion that we had had about how we were going to compensate the other employees. Never once did we ever say Victor was going to be included." After

---

[9]Gandy admitted that he did not initially recall preparing the memo and sending the email about it, and he acknowledged that during a 2006 deposition in a lawsuit by a former dealership employee, he stated that he did not remember the memo.

Gandy emailed the draft, Catalanotto never called to ask if he was included in the severance plan.

Gandy acknowledged that Catalanotto was an employee and that there was nothing in the severance pay memo that would preclude him from receiving severance pay, but he also stated that he thought the $150,000 Catalanotto received was in lieu of, or could be construed as including, severance pay. And he stated that Catalanotto should not receive two payments; that is, because Catalanotto had the February 21, 2003 compensation agreement, he should not also be eligible to receive severance pay under the severance agreement. On cross-examination, Gandy gave the following testimony:

> Q. Looking at this paragraph down here [in Plaintiff's Exhibit 1] with the $150,000 payment in it, this $150,000 was to be paid to Mr. Catalanotto after operations have ceased—it was to be paid upon cessation of operations by the dealership: is that correct?
>
> A. That's correct.
>
> Q. And when the dealership operations ceased, what was going to happen to Mr. Catalanotto's employment?
>
> A. Well, everybody, including Victor, was hopeful that he could land a new dealership and all of the employees would be employed by Victor in new a [sic] dealership. And that was the hope of everybody.
>
> Q. That was the hope at that time. What was going to happen to his employment at Meador Olds, though?
>
> A. Well, it would cease.
>
> Q. Okay. He would be terminated, right?
>
> A. Yes.

9

Q. And he's going to get paid $150,000 upon the termination of his employment with Meador Olds?

A. That's correct.

Gandy stated that the $150,000 payment seemed to fit within the definition of "severance" and that he would treat it as a severance bonus.[10]

Finally, Gandy explained that the severance plan did not apply to Catalanotto

> [b]ecause the idea for the severance really originated out of several meetings that Max [Spillar] and Victor and I had. And those discussions [re]volved around maintaining profitability of Meador Oldsmobile. And Victor made the point, which was a good point, that it's going to be hard to maintain profitability if he starts losing employees. And I agreed, and so did Max. We all agreed. And he also said, you know, "If we get an opportunity to have another dealership, it would be nice to have everybody still working at Meador Oldsmobile." And I agreed with that. So it was in that context that we decided to come up with a plan that would apply to all the other employees. It was never discussed, ever discussed, that Victor would be included in that severance plan. It was really designed to assist Victor and his employer to maintain profitability.

Gandy testified that Catalanotto received a copy of Spillar's calculations because they had discussions with him to make sure that it was accurate and that he was in agreement with it. Catalanotto never asked them why his earnings had been lined out or why there were no handwritten numbers beside his name. To the contrary, Catalanotto objected to the amount Randy Courtney was to

---

[10]Gandy read the definition of "severance pay" from Black's Law Dictionary to the jury, reciting, in pertinent part, "Payment by an employer to [an] employee beyond his wages on termination of his employment. Generally, it is paid when termination is not due to the employee's fault."

receive—which had been approximately $7,000 originally and which was increased to $15,000—because he needed him at the dealership, did not want him to leave, and did not think $7,000 was enough to keep him there until the end.

Catalanotto called Gandy in April 2005 about a problem with a payment from the used-car lot. In the two or three phone calls he received from Catalanotto between March and April 2005, Catalanotto never mentioned anything to Gandy about not being paid severance under the severance plan prior to the March 2007 demand letter from his attorney. Gandy stated he did not recall Catalanotto telling him that he would sue for his severance pay as well as the used car bonus.

### 5. Max Spillar's Testimony by Deposition

Spillar testified that he and Gandy came up with the severance plan and payout calculations in the last quarter of 2004 to retain the employees until they were no longer needed, to reward them for good service, and to let them share in the company's overall goodwill. There was no written memo about the severance plan, and once he and Gandy came up with the plan, they reviewed it with Catalanotto. Spillar also told his wife Greta about it, and she communicated it to the dealership's office employees.

Catalanotto asked if he could communicate the plan to the employees, and they said he could tell the shop and sales employees about it. Spillar was not present when Catalanotto told the employees about the severance plan.

11

### 6. Greta Spillar's Testimony by Deposition

Gandy and Greta's husband came up with the severance plan and told Greta about it. She did not know when Catalanotto told the employees about the severance plan but said that it could not have been in October 2004 because her husband did not create the computation schedule until the middle of December 2004, and the severance plan was not communicated to the employees until December 2004, when her secretary printed up the computation schedule and her husband calculated the amount of severance pay. She never saw a memo setting out the severance plan. Her husband gave the computation schedule to her and her secretary to write the checks for the amounts indicated. She first became aware that Catalanotto had expected to receive severance pay when Gandy called her and said they were being sued.

### 7. Victor Catalanotto's Testimony

Catalanotto agreed that Gandy and Spillar backloaded the 2003 compensation agreement to keep him there until the end and that he asked Gandy to put the agreement in writing. Plaintiff's Exhibit 1 is the final draft of the agreement.

Prior to Moorman's death, Catalanotto initially met with Gandy and Spillar once a month and later with increasing frequency. Spillar would go over the financial statement and ask questions and Catalanotto would update them on his progress in finding a new dealership. At one of their meetings in early fall 2004, Gandy and Spillar told him that they were going to devise a severance package

12

for all of the employees. He was ecstatic, both for himself and "also for the employees." He stated that Spillar was supposed to be working on the plan because, in a subsequent meeting, Gandy asked Spillar, "Have you got that stuff together on the severance yet?" And Spillar said, "No, not yet. I'm working on it."

When Gandy and Spillar first told him about the severance plan, they told him that they were going to decide what they would pay out, and the formula was discussed later. They told him what the formula would be in a meeting on October 21, 2004. He asked them if he "could go back and tell all the employees" about it, and they said he could. He immediately went back and explained the plan to the employees.[11] He did not announce the plan to the office staff—Greta's staff—because they already knew about it.

Catalanotto stated that in all of the meetings, neither Gandy nor Spillar ever told him that he would not be included in the severance plan and that no one at Meador Oldsmobile ever told him that he was not intended to be included in it. He had no reason at all to believe that he would not be included in the severance plan and believed that he would be included. However, he admitted on cross-examination that he had never specifically discussed with Gandy or Spillar whether the severance plan applied to him.

_____

[11]Catalanotto admitted that he became concerned about whether he would be able to retain the employees at Meador Oldsmobile several times between December 2000 and January 2005.

13

Gandy emailed the severance plan memo to Catalanotto and Spillar on November 4, 2004, asking if they had any comments. Catalanotto replied, "[I]n line 7, we needed to put a clause in there that if they're fired for just cause they would not collect severance." He never received a revised copy of the memo.

On January 20, 2005, Spillar told Catalanotto, "We no longer need your services," and Greta handed him an envelope. Catalanotto opened the envelope when he arrived home, looked inside, and thought, "Okay, where's the other check?" His check for his work from January 1, 2005, to January 20, 2005, was in the envelope, as was his bonus check for $150,000, but there was no severance check. He thought that there was a mistake, so he went back to the office the next day. He told Greta that he had not received his severance check, and she looked at him and said, "You got all the money you're going to get."

The next time Catalanotto spoke with Gandy was at the end of March. During his first two phone calls, Catalanotto only discussed his pay dispute with the used car lot. In his third call, Catalanotto told Gandy, "If you're not going to pay me on the [used car] lot, then I guess I'm going to have to sue for that and also for my severance pay." Gandy replied, "Well, I thought we took care of that already with you with that $150,000." Catalanotto told Gandy that the $150,000 was his bonus check. On cross-examination, Catalanotto gave the following testimony:

> Q. So you thought you were entitled to severance, [Gandy] thought the $150,000 was your severance. That was clear from that conversation, wasn't it?

A. Okay.

Q. So you have to agree with me then that your mind and his mind didn't meet on that issue, did they?

A. That's correct.

Q. Okay. And let's talk about what Max Spillar thought. Max Spillar filled out the form with all the names on it, and he left a blank by your name; isn't that right?

A. Apparently, yes.

Q. Yeah. And when he instructed Greta to cut checks, there was no check cut for you, was there?

A. No, there was not.

Q. And we know that Max is dead now, he's not here to testify. But just looking at those two facts, you'll agree with me that in his mind you weren't entitled to payment under that severance plan too, won't you?

A. I'll agree he had no intention of paying me the severance.

Q. Right. So there was no meeting of your mind and his on severance either, was there?

A. There was a meeting of the minds of the severance for all employees.

Q. Yeah. Let me rephrase the question. There was no meeting of your mind and his as to whether or not you were going to get paid severance under that plan, was there?

A. My name specifically, no.

Catalanotto admitted that, although he and Gandy had had a good relationship as business friends, he did not call, write, or email Gandy the day after he received his checks to ask about the severance check. And he admitted that the

15

deciding factor for how long he would stay at Meador Oldsmobile was not the severance plan but whether someone offered him a lot of money to go elsewhere.

## C. Procedural Posture

The jury found in favor of Meador Oldsmobile on jury question #1—a contract formation question—and the trial court entered a take-nothing judgment against Catalanotto. Catalanotto filed a motion for judgment notwithstanding the verdict (JNOV), asking the trial court to disregard the jury's finding on jury question #1 because the question pertained to a question of law for the court to decide, and he filed a motion for new trial, raising complaints about the legal and factual sufficiency of the evidence to support the jury's answer to jury question #1, error in the jury charge, and statements in defense counsel's closing argument. The trial court denied both motions, and this appeal followed.

## III. Preservation of Error

In his first issue, Catalanotto argues that the trial court erred by submitting a contract-formation question to the jury because the contract in question was unambiguous. In his second issue, he complains that the trial court abused its discretion by allowing the admission of extrinsic evidence of unexpressed subjective intent to contradict the contract's express terms.

With regard to jury question #1, Catalanotto filed the following proposed jury question:

16

**PLAINTIFF'S PROPOSED QUESTION NO. 1**

QUESTION

Did Meador Oldsmobile LLC f/k/a Meador Oldsmobile, Inc. and Victor Catalanotto agree that Meador Oldsmobile LLC f/k/a Meador Oldsmobile, Inc. would pay Victor Catalanotto "severance pay" (as defined by the November 4, 2004 memo regarding severance pay[)].

> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealings. You may not consider the parties' unexpressed thoughts or intentions.

> Answer "Yes" or "No"

The actual question submitted in the jury charge asked,

**Question No. 1:**

> Did Victor Catalanotto and Meador Oldsmobile, Inc. (*now known as Meador Oldsmobile, L.L.C.*) agree that Victor Catalanotto was to be included in the November 4, 2004, Severance Pay Plan?

> Business organizations, by their nature, cannot act without human agents. Business organizations act by and through their officers, employees, and agents. The actions of an individual on behalf of a business organization are considered the business organization's acts.

> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

> <u>To form a valid contract, the parties must have the same understanding of the subject matter of the contract and all its essential terms</u>.

> Answer "Yes" or "No."  [Underlining added.]

17

During the charge conference, Catalanotto objected only to the underlined language above, stating that it was unnecessary, superfluous, and potentially a comment on the weight of the evidence—none of which he complains about here—and the trial court overruled his objection.

We initially note that a party complaining about the jury charge must have timely and plainly made the trial court aware of the complaint and must have obtained a ruling to preserve its error. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g); *see also* Tex. R. Civ. P. 272–274. Furthermore, when the trial court has to resolve a legal issue before the jury can properly perform its fact-finding role, a party desiring to preserve the issue for appellate review must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). And finally, a party may not invite error by asking "something of a court and then complain[ing] that the court committed error in giving it to him." *Ne. Tex. Motor Lines v. Hodges*, 138 Tex. 280, 158 S.W.2d 487, 488 (1942); *see also Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) ("Parties may not invite error by requesting an issue and then objecting to its submission."), *cert. denied*, 510 U.S. 985 (1993).

Here, Catalanotto specifically requested submission of most of the component parts of jury question #1, and the only component he objected to at trial does not match his complaint on appeal. *See Banda v. Garcia*, 955 S.W.2d

18

270, 272 (Tex. 1997) (noting that the complaint on appeal must be the same as that presented in the trial court). We hold that he has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1; *Ledesma*, 242 S.W.3d at 43–44.

Likewise, although Catalanotto argues that the trial court erred by allowing "extrinsic evidence of Defendant's unexpressed subjective intent that it did not intend to include [Catalanotto] in the severance plan to contradict the express terms of a written instrument . . . thereby supposedly creating ambiguity where there was none," Catalanotto himself brought out most of the controversial testimony by Gandy during his direct examination, and he failed to object to any of Gandy's testimony brought out by the defense.[12] Because Catalanotto gave the trial court no indication that he found this evidence objectionable during trial, he has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103; *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.6 (Tex. 1989); *One Call Sys., Inc. v. Houston Lighting & Power*, 936 S.W.2d 673, 677 (Tex. App.—Houston [14th Dist.] 1996, writ denied). We overrule Catalanotto's first and second issues.

## IV. Sufficiency of the Evidence

In his third and fourth issues, Catalanotto argues that the trial court erred by entering judgment on the jury's verdict instead of granting his motion for JNOV

---

[12]The only evidence Catalanotto specifically directs us to as inadmissible is "Mr. Gandy's testimony about his subjective intent regarding the Severance Pay Memo."

because the jury's answer to the contract-formation question was wrong, as there was no evidence to support it. He also argues that the evidence was factually insufficient to support the jury's answer.

## A. Standards of Review

A trial court may disregard a jury verdict and render JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper, i.e., when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent, or when the evidence is insufficient to raise a material fact issue. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding

20

under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## B. Ambiguity

With regard to contract interpretation, this court has previously stated,

When construing contracts, our primary concern is to ascertain the true intent of the parties as expressed in the contract. We must examine and consider the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. "We presume that the parties to the contract intend every clause to have some effect. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties used them in a technical or different sense." A specific contractual provision controls over a general provision.

Lack of clarity or a disagreement among the parties does not necessarily create an ambiguity. Rather, whether "a contract is ambiguous is a question of law that must be decided by examining

21

the contract as a whole in light of the circumstances present when the contract was entered." "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." But if a contract is ambiguous, then interpretation of the contract presents a fact issue for the jury. "When the [contract] is not ambiguous on its face, extrinsic evidence may not be used to create an ambiguity."

*Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 772–73 (Tex. App.—Fort Worth 2010, no pet.) (internal citations omitted).

The November 2004 memorandum is the only expression of the October 21, 2004 oral contract's terms. Catalanotto argues that it is "not ambiguous as to the class of persons who can accept the severance offer because it expressly includes 'All Employees of Meador Oldsmobile, Inc.'" Nonetheless, the memorandum's plain language also appears to separate the "General Manager" (Catalanotto) from the "you" referred to as "the employees," specifically, in the first paragraph (referring to the "plan the General Manager presented to *you*"), the second paragraph ("until such date as determined by the General Manager that *your* services are no longer needed"), and the last paragraph ("If *you* have any questions, please see the General Manager for clarification."). [Emphases added.]

Furthermore, the trial court and the jury heard differing testimonies about the oral contract's circumstances. While all of the witnesses agreed that the severance plan was in response to the changing conditions at Meador Oldsmobile, Gandy stated that Catalanotto helped create the plan, while

22

Catalanotto and Spillar said it was presented to Catalanotto by Gandy and Spillar.  Because it is not entirely clear from the face of the document whether the "General Manager" was in a class separate from the employees referred to as "you," and because the evidence conflicted about who participated in creating the agreement, the memo is ambiguous.  Therefore, a material question of fact existed for the jury to resolve.[13]

## C.  Meeting of the Minds

A valid contract requires a meeting of the minds.  *Rice v. Metropolitan Life Ins. Co.*, 324 S.W.3d 660, 670 (Tex. App.—Fort Worth 2010, no pet.).  In determining whether mutual assent is present, courts consider the communications between the parties, the acts and circumstances surrounding the communications, and any course of dealing between the parties.  *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2010, pet. filed) (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co*, 480 S.W.2d 607, 609 (Tex. 1972)).  The determination of a meeting of the minds is based on the objective standard of what the parties said

---

[13]During the hearing on Meador Oldsmobile's motion for directed verdict, the trial court spelled out the jury issue:

> [W]hat we're going to do is we're going to submit a charge to the jury that inquires as to whether or not the contracting party . . . entered into a contract with the plaintiff.  And that's what this all boils down to.  It's up or down, "yes" or "no."  If they did, the contract says how he calculates what he's supposed to get.  If it didn't, he doesn't get it.

and did, not on their subjective states of mind. *Id.* This determination is a question of fact, and the factfinder's decision that one party reasonably drew the inference of a promise from the other party's conduct will be given legal effect. *Id.*

Plaintiff's Exhibit 1, the February 21, 2003 compensation agreement signed by Catalanotto and Gandy and Spillar, and the testimony about it, shows that Catalanotto had a separate agreement in place before the controversial severance agreement was contemplated by anyone. It memorialized the parties' agreement on November 18, 2002, between Gandy, Spillar, Moorman Meador, and "you," meaning Catalanotto, setting out a new floor for Catalanotto's compensation as general manager and agreeing to pay him an additional $150,000 bonus if he stayed as general manager until operations ended.

As noted above, Plaintiff's Exhibit 2, the November 4, 2004 severance pay memo, is ambiguous with regard to whether Catalanotto fits into the "you" of the employees or if he is held out separately as the general manager. Defendant's Exhibit 4, Gandy's email asking for comments from Catalanotto and Spillar, to which the memo was attached, supports Gandy's testimony that Catalanotto was involved in developing the severance plan from the beginning. According to Gandy, he and Spillar never told Catalanotto that he would be included in the plan to compensate the other employees and to give them an incentive to stay until the end, and Catalanotto never asked for clarification, even after receiving Spillar's payout calculations, which had no severance payout calculation for him.

24

Catalanotto admitted that he had never specifically discussed with Gandy or Spillar whether the severance plan applied to him. And, according to Gandy, Catalanotto's reason to develop the severance plan with the co-trustees involved his interest in keeping the employees together for his future dealership plans, an interest that was separate and apart from that of his mutual interest with the co-trustees in maintaining the existing dealership's profitability.

The jury had the responsibility to evaluate the witnesses' credibility and to determine whether there was a meeting of the minds between Catalanotto and the co-trustees. Based on Gandy's testimony, the jurors could have reasonably found that there was no meeting of the minds as to Catalanotto's inclusion in the severance plan because Catalanotto helped develop it and because there was no evidence presented that he had ever been told he would be included or that he ever asked Gandy and Spillar whether he would be included in it. *See Uniroyal Goodrich*, 977 S.W.2d at 334. We hold that the evidence is legally sufficient to support the jury's verdict and that the trial court did not err by denying Catalanotto's motion for JNOV.

And although Spillar's and Catalanotto's testimonies about only Gandy and Spillar devising the severance plan supports Catalanotto's theory that he was included in the plan as an "employee," as does Catalanotto's testimony that no one ever told him that he was *not* intended to be included in it, the jury could have reasonably chosen to disbelieve this. Therefore, we hold that the evidence is also factually sufficient to support the jury's verdict and that the trial court did

25

not abuse its discretion by denying Catalanotto's motion for new trial. We overrule Catalanotto's third and fourth issues.

## V. Jury Argument

In his fifth issue, Catalanotto argues that defense counsel created error by twice instructing the jury to ignore the trial court's instructions during closing arguments. Specifically, he complains of the following remarks made while defense counsel discussed the jury charge with the jury:

> Now, there's this other paragraph up here. "In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including"—that "including" word—"any earlier course of dealing."

> *You're not limited to what happened before. You can also include things that happened after.* This is making it clear that you can take into account the earlier course of dealing. *So the comments of the parties afterwards is not something you just disregard.* [Emphasis added.]

And defense counsel subsequently restated, "In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including what happened before. *Doesn't exclude what happened afterward.*" [Emphasis added.]

Generally, an objection must be made immediately after the contested statement, or the error is waived. *Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 653 (Tex. 1977). However, a complaint of incurable jury argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *See* Tex. R. Civ. P. 324(b)(5); *Phillips v. Bramlett*, 288

S.W.3d 876, 883 (Tex. 2009). Catalanotto raised his complaint about incurable jury argument in his motion for new trial.

Control of counsel's conduct during jury argument rests in the sound discretion of the trial court. *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied); *see also* Tex. R. Civ. P. 269. The test for improper jury argument is whether, based on the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument. *See Phillips*, 288 S.W.3d at 883. Reversal is required only when the entire record shows that the argument was improper, uninvited and unprovoked, preserved, and incurable by instruction, withdrawal, or trial court reprimand. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

Incurable jury argument is rare because "[t]ypically, retraction of the argument or instruction from the court can cure any probable harm . . . ." *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). The burden to prove that improper argument was incurable rests on the claimant. *Jones v. Rep. Waste Servs. of Tex., Ltd.*, 236 S.W.3d 401, 402 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "A jury argument is 'curable' when the harmful effect of the argument can be eliminated by a trial judge's instruction to the jury to disregard what they have just heard. The error is 'cured' and rendered harmless by the instruction." *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968).

And the complaining party on appeal must explain why opposing counsel's argument was incurable based on an evaluation of the entire case, from voir dire to closing argument. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 707 (Tex. App.—Dallas 2008, no pet.) (op. on reh'g).

We note initially that, contrary to Catalanotto's argument, the charge itself does not prohibit the jury from considering what the parties did *after* they reached their agreement. Rather, the charge states, "In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, *including any earlier course of dealing*. You may not consider the parties' unexpressed thoughts or intentions." [Emphasis added.]

Furthermore, Catalanotto fails to explain why defense counsel's argument was incurable based on an evaluation of the entire case. *See Dieterich*, 270 S.W.3d at 708 ("[T]he Company does not explain why the arguments were incurable based on an evaluation of the whole case. And after examining the entire record, we cannot say that the error was so harmful that its effect could not have been removed by a proper curative instruction."). Catalanotto failed to object to the complained-of argument either time defense counsel made it, which—if the argument were improper—would have been curable by an instruction to the jury to disregard the argument and follow the law as set out in the court's charge. *See Standard Fire Ins.*, 584 S.W.2d at 839–41; *see also Smith v. Cox*, 446 S.W.2d 52, 63 (Tex. Civ. App.—Corpus Christi 1969, writ ref'd n.r.e.) (holding no prejudicial error when appellants complained of incurable harm

but the trial court overruled some of their objections, partially sustained others, and also "admonished appellees' counsel to refrain from citing law which was not contained in the charge; several times the court instructed the jury to consider only such law as was in the charge"); *cf. Penalver*, 256 S.W.3d at 681 (reciting that appeals to racial prejudice; unsupported, extreme, and personal attacks on opposing parties and witnesses; and accusing an opposing party of manipulating a witness without evidence of witness tampering can all be incurable jury argument). And based on the record before us, we cannot say that the jury argument, if improper, was so extreme that a juror of ordinary intelligence could have been persuaded to change his verdict because of it. *See Phillips*, 288 S.W.3d at 882–83. We overrule Catalanotto's fifth issue.

## VI. Conclusion

Having overruled all of Catalanotto's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: March 3, 2011